## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**RUSTIC RETREATS LOG HOMES, INC.**
**d/b/a Pioneer Log Homes Midwest,**

       **Plaintiff,**

       **v.**

                   **Case No. 19-CV-1614**

**PIONEER LOG HOMES OF BRITISH**
**COLUMBIA INC. and**

**PIONEER LOG HOMES OF BRITISH**
**COLUMBIA, LTD.,**

       **Defendants.**

---

### ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

On October 18, 2019, Rustic Retreats Log Homes, Inc. ("Rustic") filed a lawsuit in Ozaukee County Circuit Court against Pioneer Log Homes of British Columbia Inc. and Pioneer Log Homes of British Columbia, Ltd. (collectively "Pioneer"). (Case No. 2019CV000417; Compl., Docket # 1-1 at 4–12.) The complaint alleged that Pioneer violated the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. ch. 135, by terminating its dealership agreement with Rustic without good cause or adequate notice. (*Id.*) Rustic filed a motion for a preliminary injunction in the circuit court on October 22, 2019. (Declaration of Ann M. Maher ¶ 2, Docket # 20.)

On November 4, 2019, Pioneer removed the case to federal court pursuant to 28 U.S.C. § 1441(b). (Docket # 1.) Rustic filed a motion for a preliminary injunction in this court on December 20, 2019. (Docket # 17.) On February 11, 2020, the case was reassigned to me upon the parties' consent to magistrate judge jurisdiction. (Docket # 34.) On February 18,

2020, I held a status conference at which I informed the parties I would take the motion under advisement. (Docket # 36.) The motion is fully briefed and both parties have submitted supplemental information. (Docket # 18, 24, 30, 32, 37.) For the reasons below, the motion for a preliminary injunction will be granted in part.

## BACKGROUND

Pioneer is a wholesale distributor of handcrafted logs and log home structures. (Compl. ¶ 3.) Rustic alleges that it originally entered into a dealership arrangement with Pioneer around January 2002, whereby it purchased log homes for resale and performed sales and building services on Pioneer's behalf. (*Id.* ¶ 7.)

Pioneer entered into a written distributorship agreement (the "Agreement") with Rustic on February 1, 2017.[1] (Agreement, Compl. Ex. A, Docket # 1-1 at 13–22.) The Agreement appointed Rustic as Pioneer's exclusive distributor for most of Wisconsin and Michigan, parts of Illinois, and all of Minnesota (the "exclusive territory"). (Agreement ¶ 1.) It also appointed Rustic as a non-exclusive distributor in Iowa and parts of Illinois and Indiana. (*Id.*) Rustic agreed to pay Pioneer the wholesale price for all "Products" ordered by or for customers. (*Id.* ¶ 3(a).) The Agreement limited Rustic's sales activities to its distributorship territory. (*Id.* ¶¶ 5(a), (c).) The Agreement required Rustic to sell the "Products" only pursuant to Pioneer's trade name. (*Id.* ¶ 6(b).) The Agreement also contained the following provisions:

---

[1] Rustic asserts that for reasons Pioneer did not explain, it required the Agreement to be with Pioneer Nevada, a wholly owned subsidiary of Pioneer British Columbia. Rustic asserts that no one from Pioneer Nevada was ever involved in the relationship; Pioneer British Columbia carried out all of the obligations under the Agreement; all sales leads came from Pioneer British Columbia; all contracts for the purchase of log homes were between Rustic, Pioneer British Columbia, and the ultimate homeowner; all communications, including price quotes, came from Pioneer British Columbia; and Rustic received invoices from and made payments to Pioneer British Columbia. (Compl. ¶¶ 17–18.)

2

> [Rustic] shall actively and reasonably: (i) promote the marketing and sale of the Products in the Territory; . . . [and] (iii) comply with all reasonable specifications established by [Pioneer] from time to time for the marketing, handling, storage, and shipping of Products. In addition and without limitation, [Rustic] shall actively and reasonably promote the sale of the Products in the Territory in accordance with the Distributorship Sales Promotion Standards and Terms . . . as the same may be amended by [Pioneer] from time to time in [Pioneer]'s sole discretion.
>
> [Rustic] shall conduct business in a manner that reflects favorably on the Company and shall not engage in any unfair, unlawful, or deceptive practices.
>
> [Rustic] shall utilize all sales leads furnished by Company in conjunction with the Products.

(*Id.* ¶¶ 6(b)–(e).) The Agreement also required Rustic to reasonably protect Pioneer's goodwill and reputation and to comply with Pioneer's reasonable requests regarding use of trademarks. (*Id.* ¶¶ 6(g), (j).) Rustic also assumed responsibility for maintaining the confidentiality of the following:

> [A]ll communications between [Rustic] and [Pioneer], and particularly, information relating to (1) costs and prices of the Products to [Rustic]; (2) Costs of the Products and services of [Pioneer]; (3) General and administrative rates; (4) Marketing strategies; (5) customer lists; (6) Business plans; (7) Proposals (bid and planned); (8) Product or service development; and (9) memoranda, reports, manuals, or other documents containing or discussing such information.

(*Id.* ¶ 13.)

The Agreement was to be automatically renewed annually and continue until terminated by mutual agreement. (*Id.* ¶ 10(a).) The Agreement could be terminated at will by Rustic. (*Id.* ¶ 10(b).) Pioneer could terminate the Agreement without notice upon any of the following actions by Rustic: assignment or attempted assignment of the Agreement; discontinuance of active marketing, distribution, or sale of Pioneer products for six consecutive months; conversion or embezzlement of property of either party or a third party; failure to obtain or maintain necessary licenses or permits; failure to pay required taxes; failing

3

to satisfy any civil judgment against it exceeding $10,000; or failure to remit funds due Pioneer. (*Id.* ¶ 10(c).) Both parties had the right to cancel the Agreement if the other failed to carry out any of the conditions of the Agreement, provided they gave written notice and thirty (30) days to comply. (*Id.* ¶¶ 11, 18.) Finally, the Agreement specified that any change, termination, waiver, amendment, or modification of any of the provisions of the Agreement would be non-binding unless in writing and signed by authorized representatives. (*Id.* ¶ 19.)

The president of Pioneer, Bryan Reid, Jr., explains that distributors, including Rustic, obtain most of their customers through direct leads provided by Pioneer. (Declaration of Bryan Reid, Jr. ("Reid Decl.") ¶¶ 8, 14, Docket # 26.) Reid states that Rustic was the only distributor to whom it granted regional exclusivity and the only distributor allowed to set its own prices; Pioneer gave Rustic a wholesale price for each home and Rustic determined the retail price. (*Id.* ¶ 10.)

Rustic states that it has invested substantial time and resources in building the Pioneer Log Homes of British Columbia name in Wisconsin, including $20,000–$80,000 per year in advertising and promotion as well as hundreds of thousands of dollars in the inventory, facilities, and goodwill of the business. (Compl. ¶ 8.) Rustic explains that it has spent more than sixteen years building Pioneer's brand name in Wisconsin, including investing in a billboard on I-43 and building a $450,000 model Pioneer log home, and also purchased, maintained, and stored all necessary trucks, tools, and equipment for the reassembly of products. (*Id.* ¶ 9.) Rustic indicates that more than 95% of its gross revenues and profits have derived from sales of Pioneer products. (*Id.* ¶ 10.) Until "very recently," at least 95% of Rustic's time and efforts were devoted to the sales of Pioneer products. (*Id.* ¶ 11.) Until 2011, Rustic had up to five full-time employees devoted to Pioneer products; since then, Rustic has

"networked and subcontracted" adequate additional resources to aid in reassembly of Pioneer products. (*Id.*) Rustic has used the Pioneer name and trademark since the dealership relationship began. (*Id.* ¶ 12.) At Pioneer's request, it also changed the name under which it does business to Pioneer Log Homes of Wisconsin, Inc. (*Id.* ¶ 13.) Rustic asserts that its efforts and investments under the dealership agreement led to increased sales and name recognition for Pioneer. (*Id.* ¶ 14.)

The president of Rustic, John Leszczynski, explains that when Rustic sells a Pioneer Log home to a customer, he works collaboratively with the customer, a [Pioneer] designer, and a builder. (Decl. of John Leszczynski ("Leszczynski Decl.") ¶ 12, Docket # 19.) Customers enter into a Log Structure Design Agreement ("Design Agreement") with Pioneer, whereby the customer pays a design fee in exchange for a customized design plan. (*Id.* ¶¶ 36, 38; *see also* Docket # 19-5.) Reid explains that Pioneer "produces these proprietary designs at a loss as part of its business strategy to secure customer sales, and the designs are intended for use only in connection with log homes manufactured and built by Pioneer." (Reid Decl. ¶ 7.) A sample Design Agreement states, "It is expressly understood and agreed that the said plans are to be the property of both the Client (s) and of Pioneer Log Homes of British Columbia Ltd." (Docket # 19-5 ¶ 6.)

Leszczynski asserts that some customers have asked Rustic if they could work with a different supplier after the purchase of a "Log Structure Design Plan" from Pioneer, to get more competitive pricing or a preferable timeframe. (Leszczynski Decl. ¶ 46.) Leszczynski claims that throughout the term of the Agreement, Pioneer was aware that Rustic had worked with different builders for particular projects and never expressed any objection to it until recently. (*Id.* ¶ 47.) Reid avers that Pioneer did not authorize Rustic to work with competitors

and had no knowledge that it was claiming it had the right to do so. (Reid Decl. ¶ 10.) Reid says that Pioneer's standard business practice is to require its distributors to commit to selling only Pioneer log homes and to strictly prohibit its distributors from selling log homes designed and manufactured by any of Pioneer's competitors. (*Id.* ¶ 8.)

Rustic alleges that in summer 2016, Pioneer sold products directly to a consumer in Rustic's exclusive territory, which Rustic asserts breached the Agreement and violated the WFDL. (Compl. ¶ 20.) Pioneer explains that it ended up with some pre-built inventory as a result of a contract cancellation and sold some to a customer in Rustic's territory, paying Rustic a 10% commission on the sale. (Reid Decl. ¶ 15.) Leszczynski claims that after Rustic objected to the direct sale and explained that the sale was a violation of its exclusive rights under the Agreement and a violation of the WFDL, Pioneer ceased direct sales in Rustic's exclusive territory and, as far as Rustic knew, continued to honor the Agreement in that regard. (Leszczynski Decl. ¶ 21.)

Reid states that while Rustic sold at least eighty Pioneer log homes between 2002 and 2017, it did not close a single new Pioneer log home sale in 2018 or 2019. (Reid Decl. ¶¶ 16–17.) Reid claims that no other regional distributor suffered a similar drop-off in production during this time period. (*Id.* ¶ 16.) Reid asserts that Leszczynski did regularly contact Pioneer's design team requesting that project design plans be completed as soon as possible. (*Id.* ¶ 17.) Prior to February 19, 2019, Rustic had six prospective jobs in progress in Pioneer's database, each at different stages in the process and all originating from leads Pioneer had sent to Rustic. (*Id.* ¶ 19.)

Pioneer's sales manager, Gary Crosina, asserts that in 2019 he contacted Leszczynski to inquire about Rustic's clients, designs, and quotes. (Declaration of Gary Crosina ("Crosina

6

Decl.") ¶ 4, Docket # 25.) Crosina states that Leszczynski provided no explanation for Rustic's lack of Pioneer sales since 2017 and said that he had no clients ready to commit to proceeding with Pioneer. (*Id.*) On May 28, 2019, Crosina called Leszczynski and asked him to agree that if the Pioneer design team drew plans for a customer, Leszczynski would not take those plans to another log home manufacturer for quoting or to commission them to build from the plans. (Leszczynski Decl. ¶ 41; Crosina Decl. ¶ 5.) Crosina asserts that Leszczynski verbally agreed to this. (Crosina Decl. ¶ 5.) Crosina followed that telephone conversation with an email stating the following: "To confirm our conversation on the design. If Pioneer design team draws the floor plans for your client (s) you have agreed not to take those to Top Notch for quoting and or to commission them to build from the plans." (Docket # 19-6 at 2.) Leszczynski replied that he was "happy to agree to those terms" but explained that the policy did not make it easier for him to work with Pioneer and he believed it would have unintended consequences. (*Id.* at 1–2.) He explained that the policy "actually encourages me to go outside of Pioneer for services" and suggested that a better approach would be for Pioneer to lower its prices so it could be more competitive. (*Id.* at 2.) Leszczynski finished, "Let me know if this is the policy change you really want to implement." (*Id.*) Crosina responded, "[I]t is not a new policy, [but] an understanding between you and me so I can do some patch work here at the office." (*Id.* at 1.) Leszczynski asserts that he did not enter into Crosina's proposed "understanding" and no one at Pioneer raised the issue with him thereafter. (Leszczynski Decl. ¶ 43.)

On February 19, 2019, three of Pioneer's managers and lead builders left Pioneer to start a competing log home manufacturing business, Top Notch Log Homes Ltd. ("Top Notch"). (Reid Decl. ¶ 20.) Top Notch posted photos on social media sites of a log home it

had under construction with a layout identical to a custom design Pioneer had recently completed for clients working with Rustic. (*Id.* ¶ 21.) Reid states that at some point in 2019, Pioneer received a call from a contractor in Rustic's territory asking questions about a log home he was assembling from blueprints with the Pioneer logo and contact information, even though Pioneer did not have any active building projects in the territory at that time. (*Id.* ¶ 22.) Crosina also states that Pioneer received a call from a contractor in Rustic's distributorship territory regarding one of Pioneer's custom log design blueprints that had been designed for Rustic customer Jeffrey Law. (Crosina Decl. ¶ 6.) Crosina contacted Leszczynski, who indicated that he could not discuss the matter because he had a non-disclosure agreement with Law and that he had not generated recent sales for Pioneer because its pricing was too high. (*Id.*) In July 2019, Crosina attempted to address the pricing concern by lowering its quotes for projects Leszczynski claimed to have in development. (*Id.* ¶ 7.) However, the Law project was already being built by a competitor, and Rustic failed to close a single sale in the five weeks following Pioneer's offer of reduced pricing. (*Id.*; Reid Decl. ¶ 23.)

Reid avers that "[a]t this point, Pioneer determined that there was no plausible conclusion other than that Rustic had been conspiring with the former Pioneer employees that started Top Notch since 2018 to misappropriate prospective Pioneer clients (provided to Rustic as leads from Pioneer) by using Pioneer's established branding and proprietary custom log home designs." (*Id.* ¶ 23.) Reid states that Pioneer then ceased sending leads to Rustic and removed Rustic from its list of approved distributors "to prevent further damage to its reputation and business." (*Id.* ¶ 24.) Crosina states that once he "uncovered Rustic's conspiracy . . . to use Pioneer's proprietary designs to steal Pioneer's prospective clients," he

8

contacted the clients Rustic claimed to have in development and offered them significantly reduced pricing in an attempt to retain those projects. (Crosina Decl. ¶ 8.) For example, on September 5, 2019, Crosina emailed Law as follows:

> This letter is to inform you that Pioneer Log Homes of British Columbia (PLH), due to unforeseen circumstances will no longer be affiliated with Pioneer Log Homes Midwest – C/O John Leszczynski. Since your original request came through PLH we wish to deal with you directly as our cherished customers.
>
> . . . We look forward to working directly with you, our clients, to make your log home dreams reality.
>
> I have included in this email your Preliminary Quote/Schedule A for your log home package.

(*Id.* ¶ 23; Compl. Ex. B, Docket # 1-1 at 24.) The email included Pioneer's contact information and directed Law to contact Crosina with questions. (Compl. Ex. B.) Pioneer's attached quote offered to sell a Pioneer log home directly to Law for $117,000. (*Id.* at 25–27.) Pioneer had given Rustic a $149,000 quote for the same home. (Compl. ¶ 25.)

Rustic asserts that it later learned that in September 2019, Pioneer also directly quoted a price of $190,000 for a log home package to Rustic customers Kevin and Linda Reya for a home in the exclusive territory. (*Id.* ¶ 26.) In January 2019, Pioneer had quoted Rustic $233,000 for the same package. (*Id.*) Rustic alleges that, since then, Pioneer has contacted other customers in the exclusive territory, stating that Rustic is no longer a Pioneer dealer and offering to sell them homes at 40–50% lower than the price Rustic quoted to the customers. (*Id.* ¶ 27.) Pioneer asserts that the effort was designed solely to salvage the business relationships with the clients that Rustic and Top Notch were attempting to steal and that Pioneer could not realize a profit on the projects. (Crosina Decl. ¶ 8.)

On September 17, 2019, counsel for Rustic wrote to Pioneer's counsel notifying them of the alleged breach of the Agreement and violation of the WFDL, as follows:

[. . .]

> Notwithstanding Rustic Retreats' exclusive rights under the Distributorship Agreement, Pioneer recently violated the terms of the Agreement and the Wisconsin Fair Dealership Law by, among other things, (a) falsely stating to customers and potential customers in the territory that the Distributor Agreement had been terminated and that Pioneer would, and could, sell homes to them directly; (b) completing with Rustic for the sale of homes in its exclusive territory and, in at least three instances of which we are aware, offering to sell homes directly to those customers for as much as 40% of the retail price of the home.

(Docket # 19-4 at 1.) The letter demanded an immediate cessation of these activities and demanded copies of all communications between Pioneer and anyone in the relevant territory to whom Pioneer had made such representations, provided a quote, or sold a home; copies of invoices for such sales; proof that Pioneer had notified every such customer that Rustic was in fact the exclusive dealer and that orders must be placed through it; and confirmation that Pioneer had stopped its illegal activity. (*Id.* at 2.)

On September 25, 2019, counsel for Pioneer replied that Section 6 of the Agreement was a covenant by Leszczynski to sell exclusively Pioneer Log Homes products:

> The evidence is clear and unequivocal that [Leszczynski] has engaged in sale of log homes through other individuals, most notably individuals who were former employees of Pioneer Log Homes and who are in direct competition with Pioneer Log Homes. Even more egregious is the fact that your client improperly used proprietary property of Pioneer Log Homes (specifically the log shell package drawn and designed by Donna Fitzel, who is an employee of Pioneer Log Homes of British Columbia Ltd.), when he commissioned a competitor of Pioneer Log Homes of British Columbia Ltd. to build the home designed by Ms. Fitzel. The design and drafting and architectural plans created by Ms. Fitzel while in her employ with my client are clearly my client's property and cannot be used by your client to have other companies build the structure.

(Docket # 19-3 at 1–2.) The letter proposed that either Leszczynski sign a new Distributorship Agreement confirming that he acts solely and exclusively for the sale of Pioneer, or that he remove all reference to Pioneer from his website and cease sales of Pioneer products in his

area. (*Id.* at 2.) The letter stated that "[t]he breaches of proprietary property and the breach of confidence by your client in the above-noted circumstances are considered exceptionally serious by my client, especially given the long relationship between these parties." (*Id.*)

Rustic asserts that from October 2016 through the date of the complaint, Pioneer never stated or even suggested that Rustic's performance was deficient or gave notice of its intent to terminate the Agreement if Rustic failed to cure any such deficiency. (Leszczynski Decl. ¶¶ 22–24, 34.) Leszczynski states that the first and only time Pioneer ever mentioned a breach of the Agreement was in the September 25, 2019 letter from Pioneer's counsel in response to his counsel's letter. (*Id.* ¶ 35.) Rustic alleges that as a result of Pioneer's actions, customers have expressed confusion over whether Rustic is Pioneer's exclusive dealer and, if so, why Pioneer has indicated otherwise. (*Id.* ¶ 28.) Rustic indicates that it has lost the confidence, and some of the business, of those customers and will have to earn that trust back. (*Id.*)

## ANALYSIS

Rustic requests a preliminary injunction requiring Pioneer to honor the Agreement pending trial, along with other relief. (Compl. ¶ 38.) For the reasons below, Rustic's motion will be granted in part. Pioneer will be ordered to honor the terms of the Agreement and not terminate the dealership before trial. Rustic shall be required to post a bond of $65,000.00.

### 1. *Preliminary Injunction*

#### 1.1 Legal Standard

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citations omitted). Granting a preliminary injunction involves the "exercise of a very far-reaching power" and is "never to be indulged

11

in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus. Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citations omitted).

To justify a preliminary injunction, the movant must first make a threshold showing that it has a reasonable likelihood of success on the merits, no adequate remedy at law exists, and it will suffer irreparable harm if a preliminary injunction is denied. *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). If the movant makes this preliminary showing, the court then considers whether the irreparable harm the movant will suffer without injunctive relief is greater than the harm the non-movant will suffer if the preliminary injunction is granted, and whether a preliminary injunction will harm the public interest. *Starsurgical, Inc. v. Aperta, LLC*, 832 F. Supp. 2d 1000, 1002 (E.D. Wis. 2011). If the movant does not make the required preliminary showing, "then the district court's analysis ends and the preliminary injunction should not be issued." *Adams v. City of Chicago*, 135 F.3d 1150, 1154 (7th Cir. 1998) (citation omitted).

A district court may grant a preliminary injunction based on less formal procedures and on less extensive evidence than a trial on the merits. *Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010); *see also Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997) ("Affidavits are ordinarily inadmissible at trials but they are fully admissible in summary proceedings, including preliminary-injunction proceedings.").

### 1.2  Reasonable Likelihood of Success on the Merits

A movant can establish that it is likely to succeed on the merits by showing that its chances of prevailing are better than negligible. *Omega Satellite Prods. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir. 1982); *see also Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir.

12

1986) ("Although the plaintiff must demonstrate some probability of success on the merits, the threshold is low." (citation omitted)).

This low bar is easily met in this case. Rustic bases its request for a preliminary injunction on Pioneer's alleged violation of two provisions of the WFDL. (Docket # 18.) Section 135.03 of the WFDL states that no grantor may terminate, cancel, fail to renew, or substantially change the competitive circumstances of a dealership agreement without good cause. Section 135.04 requires that before taking such action, a grantor must provide at least ninety days' prior written notice and sixty days in which to rectify any claimed deficiency before taking such action. Pioneer failed to provide Rustic with anything that could be considered satisfactory written notice and an opportunity to cure before effectively terminating the Agreement. This suffices to make the threshold showing of a reasonable likelihood of success on the merits.

Pioneer argues that there is no likelihood of success on the merits because Rustic's bad-faith conduct constituted grounds for termination and Rustic's bad faith made the defects inherently uncurable, negating any responsibility Pioneer had to provide notice and an opportunity to cure. (Docket # 24 at 16–23.) Even if Pioneer ultimately prevails on this theory, at this stage, the evidence of bad faith is not conclusive. Pioneer accuses Rustic of using "Pioneer's custom log home design, developed individually for a Pioneer client, to build a log home for that client with a competitor, cutting Pioneer out of the deal," asserting that this constituted not only a breach of the Agreement but several torts. (*Id.* at 16–19.) However, it is not clear that these alleged actions violated the Agreement, let alone that they constituted bad faith. On its face, the Agreement does not unambiguously state that Rustic cannot work with other builders after a client purchases a Pioneer design, and Rustic asserts that Pioneer

13

knew it had done so in the past without objection. The Agreement also does not clearly state that Rustic had to keep design plans confidential. The communications between Lesczynski and Cronisa in May 2019 appear to confirm that the parties did not have a clear understanding on these issues. Similarly, the Design Agreement states that ownership of the designs belongs to both the client and Pioneer, but does not specify what rights that joint ownership conferred. On its face, the Design Agreement does not forbid a client from taking that design to another builder, or put the onus on Rustic to ensure that the client does not do so. Thus, it is not entirely clear that Rustic violated the Agreement at all.

Even if Rustic did violate the Agreement, it is not clear that Rustic's behavior constituted bad faith, rather than a good-faith misunderstanding of or disagreement about the terms of the Agreement. As explained, the Agreement and associated documents are not as clear about Rustic's obligations as Pioneer asserts. Furthermore, Pioneer accuses Rustic of conspiring with Top Notch to undermine Pioneer, but offers no direct evidence of any such conspiracy. Pioneer's representatives essentially admit that they concluded that there was such a conspiracy based on circumstantial evidence. At this stage, I see no evidence of unequivocal bad faith that would have justified terminating the Agreement without notice and an opportunity to cure.

Rustic's alleged actions were also not inherently incurable. The claimed deficiencies were failing to keep design plans confidential and enabling clients to use other builders; the cures would be to keep plans confidential and refrain from facilitating clients' use of other builders. Certainly, direct and incontrovertible evidence of serious bad-faith conduct at the time a grantor terminates a dealership may negate the notice requirement under Wis. Stat. 135.04. *See Harnischfeger Corp. v. Superior Crane Corp.*, No. 94-C-1244, 1995 Bus. Franchise

Guide (CCH) ¶ 10,618, 1995 WL 18217942 (E.D. Wis. Feb. 13, 1995) (holding that notice and an opportunity to cure were not required when distributor admitted to extreme bad-faith acts including misappropriating thousands of pages of propriety designs and marketing its own products with the grantor's label); *Miller Brewing Co. v. Hoff Distributing Co. Inc.*, No. 82CV159, at 2–5 (Wis. Cir. Ct. Portage Cty. Oct. 28, 1982) (Docket # 31-1) (holding that beer distributor's fraudulent sale of lower-grade beer as higher-quality beer and hiding its selling of overaged beer from the grantor's inspector were not remediable); *H&R Block, Inc. v. Otto*, No. 80-cv-7409, at 13–16 (Wis. Cir. Ct. Dane Cty. May 5, 1980) (Docket # 24-3) (finding remediation impossible where franchisee had engaged in criminal tax evasion). Here, though, Pioneer only inferred bad-faith conduct. Pioneer's guess—for that is what it was—that Rustic had acted in bad faith does not appear at this stage to have justified unilaterally terminating the Agreement without notice and undermining Rustic's relationship with clients.

Because at this juncture I see no obvious good cause for Pioneer to terminate the dealership agreement and no reason why Pioneer should have been exempt from providing Rustic with notice and an opportunity to cure, Rustic has shown a reasonable likelihood of success on the merits.

### 1.3    Irreparable Harm and Inadequate Remedy at Law

Irreparable harm is harm for which there is no adequate remedy at law, usually because money damages would be seriously deficient or impossible to calculate. *Roland Mach. Co.*, 749 F.2d at 386 (holding that a damages remedy can be inadequate if (1) plaintiff becomes insolvent or loses its business; (2) plaintiff is unable to finance the lawsuit; or (3) plaintiff incurs damages that are very difficult to calculate; or (4) defendant becomes insolvent or loses its business). Section 135.065 of the WFDL creates a presumption of irreparable harm when

a dealer seeks a preliminary injunction against a grantor. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1087 (7th Cir. 2008). However, federal courts construe that presumption to be a rebuttable one. *See S & S Sales Corp.*, 435 F. Supp. 2d at 885 (collecting cases); *accord Fleet Wholesale Supply Co. v. Remington Arms Co.*, 846 F.2d 1095, 1098 (7th Cir. 1988) (stating that a "district court need not treat [the statutory] presumption as conclusive"). "Where a plaintiff will not incur losses so great as to threaten its solvency and where its losses will be largely economic and thus measurable and compensable, the plaintiff does not establish irreparable harm." *S & S Sales Corp. v. Marvin Lumber & Cedar Co.*, 435 F. Supp. 2d 879, 885 (E.D. Wis. 2006) (citing *Praefke Auto Elec. & Battery Inc. v. Tecumseh Prods. Co.*, 255 F.3d 460, 463 (7th Cir. 2001)).

As a dealer seeking a preliminary injunction against a grantor, Rustic is entitled to the presumption of irreparable harm under the WFDL. Pioneer responds that the harm Rustic alleges is, at most, lost sales, such that a money judgment would sufficiently compensate Rustic. (Docket # 24 at 16.) However, Rustic has alleged not just lost sales but the potential destruction of its business—historically consisting of 95% Pioneer products—as well as harm to its reputation and goodwill. (Docket # 18 at 17–18 (citing *Menominee Rubber Co. v. Gould*, 657 F.2d 164, 167 (7th Cir. 1981) ("The loss of goodwill and the disruption of the dealer's business resulting from its termination is substantial and sufficient to constitute 'irreparable harm'."); *Reinders Bros. v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44, 47 (7th Cir. 1980); *Roland Mach. Co.*, 749 F.2d at 386. Thus, Pioneer has not sufficiently rebutted the presumption of irreparable harm in Wis. Stat. § 135.06.

16

### 1.4 Balance of Harms

As Rustic has made the threshold showing of a reasonable likelihood of success on the merits and irreparable harm, I next weigh the competing harms to the parties if an injunction is granted or denied. In doing so, "[t]he court should try to minimize the error costs, the sum of the costs of erroneously granting an injunction (should it turn out that none is warranted) and of denying an injunction (should the plaintiff prevail in the end)." *Fleet Wholesale Supply Co.*, 846 F.2d at 1097.

As noted above, Rustic faces the potential destruction of its business, which historically consisted almost entirely of sales of Pioneer products, as well as harm to its reputation and goodwill. It is admittedly questionable whether Rustic's business will be destroyed if Rustic is not allowed to sell Pioneer products during the pendency of this litigation, as it appears Rustic closed no sales of Pioneer products in 2018 or 2019. On the other hand, Pioneer admits that the sale, design, and building of a Pioneer log home is a multi-year process (Reid Decl. ¶¶ 6, 20), which weighs against reading too much into the absence of sales in 2018 or 2019.

Pioneer asserts that it will suffer a number of harms if the injunction is granted, including being forced to do business with a dealer in whom it has no confidence or trust and with whom it no longer wishes to do business. (Docket # 24 at 17–18 (citing *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 764 (2d Cir. 1979); *Harnischfeger Corp.*, 1995 Bus. Franchise Guide ¶ 10,618).) Pioneer also points to a potential loss of credibility with other distributors if it is forbidden from remedying Rustic's wrongful conduct. (Docket # 24 at 18 (citing *Super Natural Distrib., Inc. v. Muscletech Research and Dev.*, 131 F. Supp. 2d 1058, 1063–64 (E.D. Wis. 2001)).) But if Pioneer were to prevail, the harm of working with a

distributor it dislikes would be short-lived, and a favorable judgment would likely go a long way toward rebuilding Pioneer's credibility with its distributors. *Cf. Roland Mach. Co.*, 749 F.2d at 391 ("[W]e are concerned only with the period between now and the entry of a final judgment; it is only these interim losses that are relevant in deciding whether [the plaintiff] is entitled to a preliminary injunction.") Finally, Rustic's territory is just one slice of Pioneer's wider market. In sum, there is no reason to believe the alleged harms would be fatal to Pioneer.

Weighing the potential harms in the balance, I find that the potential destruction of the business Rustic has built over more than a decade outweighs the short-lived difficulties Pioneer would experience were a preliminary injunction granted. If there is any doubt about that, Rustic's likelihood of success as described above tips the balance in its favor.

### 1.5    Public Interest

A preliminary injunction for alleged violations of the WFDL is presumed to be in the public interest. *See Al Bishop Agency, Inc. v. Lithonia-Div. of Nat. Serv. Indus., Inc.*, 474 F. Supp. 828, 835 (E.D. Wis. 1979) ("In passing the Wisconsin Fair Dealership Law, the Wisconsin Legislature apparently determined that willy nilly terminations of dealerships disserved the public interest and that it served the public interest to permit termination only upon a showing of good cause. This Court will not question the validity of the legislature's findings and thus will find that the public interest will not be disserved by the issuance of a preliminary injunction."); *see also Designs in Med., Inc. v. Xomed, Inc.*, 522 F. Supp. 1054 (E.D. Wis. 1981) (applying *Al Bishop*'s reasoning to the notice provision of the WFDL). Pioneer's argument that an injunction is against the public interest because it enables or condones bad-faith

behavior (Docket # 24 at 24–26) is unpersuasive as I see no clear evidence of bad faith at this stage. The public interest inquiry need go no further.

### 2. Scope of Preliminary Injunction

Rustic demands the following relief:

(a) An injunction pending trial prohibiting Defendants, or anyone acting by or on their behalf, from directly contacting customers or potential customers in Rustic Retreats' Exclusive Territory to sell or solicit the sale of Pioneer products that are the subject of the Agreement;

(b) An order that Defendants send all sales leads to Rustic Retreats as required by the terms of the Agreement;

(c) An order that Defendants provide Rustic Retreats with wholesale pricing for Pioneer products as required by the terms of the Agreement;

(d) An order that Defendants notify every customer to whom they falsely represented that Rustic Retreats is "no longer affiliated with" Pioneer Log Homes of British Columbia that Rustic Retreats is, and has been, the Pioneer Log Homes exclusive dealer in the Exclusive Territory and that all orders for Pioneer products must be placed through Rustic Retreats; and

(e) An order that Defendants replace Rustic Retreats' name and contact information on the Pioneer Homes of British Columbia website;

(Compl. ¶ 38.) Pioneer argues that if a preliminary injunction is granted, it should be narrower in scope than Rustic requests. (Docket # 24 at 26–28.) Pioneer argues that, at most, Rustic is entitled to a resumption of dealership terms, and that any such injunction should be limited in time (90 days) and territorial scope (Wisconsin). (*Id.*)

At minimum, Pioneer should be required to honor the Agreement pending trial. Of particular note, Pioneer must provide Rustic with wholesale pricing and promptly refer all potential sales or other leads from the exclusive territory to Rustic, as well as leads from Rustic's non-exclusive territory as described in the Agreement.

19

Rustic's request that I order Pioneer to inform past or current customers that Rustic is its exclusive dealer in the territory is unwarranted. Such an order risks undue confusion to customers. Additionally, ordering Pioneer to place Rustic's name on its website is at odds with the discretion the Agreement gives Pioneer to conduct publicity. (Agreement ¶ 7(c).) Of course, Pioneer might wish to take such measures to encourage sales of its products.

Pioneer's request that any injunction be limited in time (90 days) is also unwarranted. Pioneer argues that the injunction should be limited in time because the WFDL gives it the right to terminate the Agreement ninety days after giving notice.[2] (Docket # 24 at 27.) This is not quite right; the WFDL also requires that any such termination, or effecting any substantial change in competitive circumstances, be for good cause. Wis. Stat. § 135.03. The burden is on the grantor to show good cause. *Id.* The evidence before me raises concerns about whether Pioneer had or has good cause to terminate the Agreement or to sell directly to consumers in Rustic's territory. The potential lack of good cause distinguishes this case from the one Pioneer cites, *Al Bishop* (limiting a preliminary injunction to 90 days when the only defect alleged was failure to give notice). To preserve the status quo until this issue can be determined at trial, enjoining Pioneer from terminating the Agreement is appropriate. *Cf. Reinders Bros.*, 627 F.2d at 440 (enjoining defendant from terminating its dealership agreement for pendency of the action when defendant allegedly had no good cause to do so).

Pioneer's request that the injunction be limited in territorial scope to Wisconsin is somewhat misguided. Pioneer argues that because Rustic bases its claim for a preliminary

---

[2] Even if this were correct, the proper injunction arguably would not be limited to ninety days, but would simply enjoin Pioneer from terminating the dealership without first meeting the notice requirements. *Cf. Designs in Med., Inc. v. Xomed, Inc.*, 522 F. Supp. 1054 (E.D. Wis. 1981) (enjoining defendant from terminating the dealership without first meeting the WFDL's notice requirements); *Paul Reilly Co. v. Dynaforce Corp.*, 449 F. Supp. 1033, 1036 (E.D. Wis. 1978) (same).

injunction on the WFDL, the injunction should apply only to sales in Wisconsin to avoid extraterritorial application of the WFDL in violation of the Commerce Clause. (Docket # 24 at 27–28 (citing *Morley-Murphy Co. v. Zenith Electronics Corp.*, 142 F.3d 373, 379 (7th Cir. 1998) ("[E]xtraterritorial application of the WFDL would, at the very least, raise significant questions under the Commerce Clause.")).) But *Morley-Murphy* applied that reasoning to determine that damages for direct sales in locations outside Wisconsin could not be awarded under the WFDL. Here, requiring Pioneer to honor the Agreement by forwarding sales leads from other states to Rustic does not "apply" the WFDL to any action occurring outside Wisconsin.

  3.  *Bond*

  Fed. R. Civ. P. 65(c) conditions a preliminary injunction on the posting of security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The purpose of the bond requirement is to ensure compensation for the enjoined party, if it prevails on the merits, for the monetary harm caused by a preliminary injunction. *See Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002); *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 446 (7th Cir. 1990). District courts should err on the high side when setting bond. *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir.2000) (explaining that the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and an error in setting the bond too high is not serious). A district court must provide reasons supporting the number chosen so that a reviewing court can determine whether the amount was reasonable. *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1141–42 (7th Cir. 1994).

Pioneer asserts that bond should be no less than $65,000 per month that any preliminary injunction will require Pioneer to conduct business with Rustic. (Docket # 24 at 29.) However, Pioneer has not offered any evidence that it will actually suffer any pecuniary loss from a preliminary injunction. With the grant of the preliminary injunction enforcing the dealership terms, Rustic will recommence sales of Pioneer products as required by the Agreement and pay Pioneer the wholesale price for any sale. Given that Pioneer has apparently been offering less-than-wholesale prices to customers since it terminated the Agreement, a preliminary injunction seems actually to be to Pioneer's monetary benefit.

Because I find some amount of security appropriate, but find Pioneer's suggested bond of $65,000 per month insufficiently justified, I will require Rustic to post a one-time bond of $65,000.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the plaintiff's motion for a preliminary injunction (Docket # 17) is **GRANTED IN PART**. Pioneer is ordered to comply with all the terms of the Agreement for the pendency of the litigation.

**IT IS FURTHER ORDERED** that Rustic shall give security by depositing with the Clerk the sum of $65,000.00 in a cashier's check or other certified funds within ten (10) days of the date of this order. Failure to provide the requisite security will cause the preliminary injunction order to lapse of its own accord. If Rustic provides the requisite security, the preliminary injunction shall remain in effect until further order of the court.

Dated at Milwaukee, Wisconsin this 22nd day of June, 2020.

BY THE COURT

_s/Nancy Joseph_
NANCY JOSEPH
United States Magistrate Judge