# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**RUSTIC RETREATS LOG HOMES, INC.**
**d/b/a Pioneer Log Homes Midwest,**

     **Plaintiff,**

     **v.**                       **Case No. 19-CV-1614**

**PIONEER LOG HOMES OF BRITISH**
**COLUMBIA INC. and**

**PIONEER LOG HOMES OF BRITISH**
**COLUMBIA, LTD.,**

     **Defendants.**

---

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

Rustic Retreats Log Homes, Inc. ("Rustic") filed a complaint in Ozaukee County Circuit Court against Pioneer Log Homes of British Columbia Inc. and Pioneer Log Homes of British Columbia, Ltd. (collectively "Pioneer") based on Pioneer's alleged violation of the parties' distributorship agreement. (Compl., Docket # 1-1 at 4–12.) Rustic removed the action to this Court and filed an answer denying Rustic's allegations and asserting its own counterclaims. (Answer and Counterclaims, Docket # 14.) Both parties move for summary judgment. Rustic moves for summary judgment, dismissing Pioneer's counterclaims and granting judgment in its favor on the causes of action alleged in its complaint. (Docket # 59.) Pioneer moves for summary judgment in its favor on all of Rustic's claims and on its breach

of contract counterclaim against Rustic. (Docket # 55.) For the reasons explained below, both parties' motions are granted in part and denied in part.

## FACTS

*The Parties, the 2002 Agreement, and the 2007 Agreement*

Rustic is a Wisconsin corporation with its principal place of business in Mequon, Wisconsin. (Pl.'s Proposed Findings of Fact ("PPFOF") ¶ 1, Docket # 61 and Defs.' Resp. to PPFOF ("Defs.' Resp.") ¶ 1, Docket # 66.) Pioneer Log Homes of British Columbia Inc. is a Canadian corporation with its principal place of business in British Columbia. (*Id.* ¶ 2.) Pioneer Log Homes of British Columbia, LTD is a Nevada corporation with its principal place of business in Carson City, Nevada. (*Id.* ¶ 3.) Pioneer custom designs and manufactures high-end log homes. (Defs.' Proposed Findings of Fact ("DPFOF") ¶ 3, Docket # 58 and Pl.'s Resp. to DPFOF ("Pl.'s Resp.") ¶ 3, Docket # 68.) The sole shareholder and President of Rustic since its inception is John Leszczynski. (*Id.* ¶ 2.) Bryan Reid, Jr. has been the President of Pioneer since 2017. (*Id.* ¶ 4.) Pioneer has a dedicated Sales Manager & Distributor Contact who reports directly to Pioneer's President and is responsible for communicating with Pioneer's distributors. (Defs.' Additional Proposed Findings of Fact ("Defs.' APFOF") ¶ 127, Docket # 27 and Pl.'s Reply to Defs.' APFOF ¶ 127, Docket # 72.) Gary Crosina has been the Sales Manager & Distributor Contact at Pioneer since 2010. (DPFOF ¶ 5 and Pl.'s Resp. ¶ 5.)

In January 2002, Pioneer and Rustic entered into an agreement by which Rustic became a distributor of Pioneer's log homes in the Midwestern United States. (PPFOF ¶ 5 and Defs.' Resp. ¶ 5.) Pursuant to the terms of that agreement, Rustic began advertising, promoting, and selling Pioneer's custom-built log homes in the Midwest and performing sales

and building services for Pioneer. (*Id.* ¶ 6.) In 2003, in order to raise awareness in Wisconsin about Pioneer, Rustic built a model Pioneer home on Highway 43 and Highway 60 in Grafton, Wisconsin in 2003. (*Id.* ¶ 9.) The model home was used by Rustic for office space and marketing. (DPFOF ¶ 83 and Pl.'s Resp. ¶ 83.) The model home property also contained a billboard on Highway 43 that marketed Pioneer. (*Id.* ¶ 84.) Rustic would also market Pioneer at trade shows, including displaying Pioneer's trademark and logo. (*Id.* ¶ 85.) Pioneer recommended that Rustic change its name and do business as Pioneer Log Homes of Midwest, which it did; however, Pioneer did not require Rustic to do so. (Defs.' Resp. ¶ 26 and Pl.'s Reply to Defs.' Resp. ¶ 26, Docket # 72.)

Pioneer and Rustic later entered into a written Distributorship Agreement (the "Agreement") dated February 1, 2007. (DPFOF ¶ 7 and Pl.'s Resp. ¶ 7.) Paragraph 1 of the Agreement appoints Rustic as the exclusive distributor for the purchase and resale of Pioneer's products in the following areas: (1) the State of Wisconsin, except for the area within a thirty-mile radius of the city of Reedsburg, Wisconsin; (2) the State of Minnesota; (3) the State of Michigan, except for the area within a 25 mile radius of Ludington, Michigan; and (4) the Northern State of Illinois from the US Highway #136 to the North. (*Id.* ¶ 8.) The Agreement further appoints Rustic as Pioneer's non-exclusive distributor within the State of Iowa, the remainder of the State of Illinois, and the State of Indiana. (PPFOF ¶ 15 and Defs.' Resp. ¶ 15.) Pursuant to the terms of the Agreement, Pioneer agreed to promptly refer leads or other inquiries from potential sales to Rustic in the appropriate territory. (*Id.* ¶ 17.)

Paragraph 6 of the Agreement sets forth certain duties and obligations of Rustic, including the following:

(c) Distributor shall actively and reasonably: (i) promote the marketing and sale of the Products in the Territory….

(d) Distributor shall conduct business in a manner that reflects favorably on the Company and shall not engage in any unfair, unlawful, or deceptive practices.

(e) Distributor shall utilize all sales leads furnished by Company in conjunction with the Products.

…

(g) Distributor must reasonably: (i) report to the Company all acts that might give rise to action for trademark infringement or unfair competition;

(ii) protect the Company's goodwill and reputation throughout the Territory…

(DPFOF ¶ 9 and Pl.'s Resp. ¶ 9.) The Agreement does not require Rustic to buy or maintain any Pioneer Products or inventory, nor does it require Rustic to make minimum sales. (Defs.' APFOF ¶¶ 100–01 and Pl.'s Reply to Defs.' APFOF ¶¶ 100–01.)

Paragraph 13 of the Agreement contains a "Confidential Information" provision that provides as follows:

During the term of this agreement, and at all times thereafter, Distributor shall have the responsibility of maintaining the confidentiality of all communications between Distributor and Company, and particularly, information relating to (1) costs and prices of the Products to Distributor; (2) Costs of the Products and services of Company; (3) General and administrative rates; (4) Marketing strategies; (5) customer lists; (6) Business plans; (7) Proposals (bid and planned); (8) Product or service development; and (9) memoranda, reports, manuals, or other documents containing or discussing such information.

(DPFOF ¶ 10 and Pl.'s Resp. ¶ 10.)

The Agreement contains an automatic renewal clause and provides that it shall continue from year to year until terminated by mutual agreement of the parties. (PPFOF ¶ 19 and Defs.' Resp. ¶ 19.) The Agreement further provides that if either party fails to carry out its conditions, the other party may cancel the Agreement after due demand in writing

4

addressed to the other party. (*Id.* ¶ 21.) Such written notice requires a thirty-day cure period. (*Id.* ¶ 22.) The Agreement also states that Pioneer can terminate the Agreement without notice upon the following: "(iii) The discontinuance of Distributor's active marketing, distribution or sale of Products for a period of six consecutive months; and (iv) In the event the Distributor . . . converts or embezzles property of . . . the Company." (Defs.' APFOF ¶ 116 and Pl.'s Reply to Defs.' APFOF ¶ 116.)

*Course of Conduct*

Pioneer sold its products to Rustic at wholesale prices. (PPFOF ¶ 29 and Defs.' Resp. ¶ 29.) If the retail price was below $400,000, Pioneer reduced the price by 15% and sold the package to Rustic. (*Id.* ¶ 31.) If the retail price was above $400,000, Pioneer reduced the price by 10% and sold the package to Rustic. (*Id.* ¶ 32.) A log home package is comprised of logs, labor, and overhead. (Defs.' Resp. ¶ 33 and Pl.'s Reply to Defs.' Resp. ¶ 33.) The log home package does not include the foundation, framing, windows, doors, and roof. (*Id.* ¶ 34.) The logs are cut and the log home package is assembled in British Columbia. (PPFOF ¶ 35 and Defs.' Resp. ¶ 35.) Then, the package is disassembled and shipped to the building site of Rustic's customer for reassembly on the foundation prepared by the customer. (*Id.*) Upon delivery, Rustic works with subcontractors to reassemble the log home package on that foundation and ensure that the log home package is ready for the next phase of construction. (*Id.* ¶ 36.)

The parties' relationship revolved around leads and other inquiries. (PPFOF ¶ 27 and Defs.' Resp. ¶ 27.) Potential customers would reach out to Pioneer, typically through its website; if the potential customers were in Rustic's territory, Pioneer would forward those

leads and inquiries to Rustic. (*Id.* ¶ 28.) Upon request during the sale process, Pioneer would provide Rustic with a wholesale quote for any log home package Rustic was attempting to sell to a customer in the territory. (*Id.* ¶ 37.) Rustic would take Pioneer's wholesale price quote and convert it into an all-inclusive retail price for the customer. (*Id.* ¶ 38.) Rustic would add the cost of transportation, all applicable taxes, crane time, assembly crew, and a commission to the Pioneer wholesale price quote and provide that all-inclusive retail price quote to the customer. (*Id.* ¶ 39.)

When Rustic convinces a prospective customer to consider building a Pioneer home, the customer describes the type of home and Rustic provides the customer with a standard log structure design agreement (the "Design Agreement"). (*Id.* ¶ 40.) Pioneer conducts design work directly with the customer. (Defs.' APFOF ¶ 114 and Pl.'s Reply to Defs.' APFOF ¶ 114.) Pioneer and the customer sign the Design Agreement, and it expressly states that Pioneer and the customer own the design plans. (PPFOF ¶¶ 41–42 and Defs.' Resp. ¶¶ 41–42.) However, the Design Agreement does not contain any confidentiality provisions, and Pioneer never marked its design plans as confidential. (*Id.* ¶¶ 43, 51.) Rustic asserts that it never agreed to keep the design plans confidential, while Pioneer contends that the confidentiality provision of the Agreement covers the Design Agreement as a business plan or proposal. (*Id.* ¶ 50.)

When Pioneer completed the design plans and delivered them to the customer, Rustic would get a final price quote and timetable for delivery of the log package from Pioneer. (*Id.* ¶ 54.) Rustic would mark-up the final wholesale price to cover the time and expenses associated with selling and building the home and provide a final quote to the customer. (*Id.*

¶ 55.) The customer would then enter into a three-way construction contract that identified Pioneer as the manufacturer, Rustic as the builder, and the customer as the buyer. (*Id.* ¶ 56; DPFOF ¶ 16 and Pl.'s Resp. ¶ 16.)

Rustic asserts that customers sometimes asked to work with other log home package builders because Pioneer either did not provide Rustic with competitive pricing for a log package or could not deliver a log home package within a timeframe demanded by the customer. (PPFOF ¶¶ 57–58.) Rustic further claims that Pioneer knew that Rustic worked with different builders and did not object to it doing so until it learned that Rustic was working with a company started by one of Pioneer's independent contractors. (*Id.* ¶¶ 59–60.) Pioneer claims that it did not authorize Rustic to work with its competitors and had no knowledge that Rustic was claiming the right to do so. (Defs.' Resp. ¶ 57.)

*The Griffores*

Beginning in late 2015, Rustic began working with Buck and Theresa Griffore on the design and potential sale of a log home package for an almost 11,000 square foot house (the "Main House"). (PPFOF ¶ 74 and Defs.' Resp. ¶ 74.) A June 28, 2016 preliminary quote for the wholesale price of the Main House from Pioneer to Rustic was $646,250. (*Id.* ¶ 75.) Rustic, based on that quote, provided the Griffores with an all-inclusive price of $934,000 for the Main House in July 2016. (*Id.* ¶ 76.) At the end of 2016, the Griffores changed their focus and concentrated on the design and building of a guest house instead (the "Guest House".) (*Id.* ¶ 78.) The Griffores purchased a Guest House log package from Pioneer. (*Id.* ¶ 79.) Pioneer delivered the log package in June 2017. (*Id.* ¶ 80.)

In April 2017, Pioneer and Rustic communicated about returning to designing and building the Main House. (*Id.* ¶ 81.) Rustic claims that in June 2017, Pioneer sold a $95,000 character tree directly to the Griffores, while Pioneer asserts that the sale of the tree is not complete because the Griffores only made a deposit and have not taken or planned delivery. (*Id.* ¶ 83.) Rustic contends that Pioneer will probably build the Main House in Rustic's exclusive territory and estimates the wholesale price of the log package for the Main House to be around $1,000,000. (*Id.* ¶¶ 89–90.)

*Top Notch*

Joel Roorda is an independent handcrafter of log homes who worked with Pioneer for 25 years. (DPFOF ¶ 21 and Pl.'s Resp. ¶ 21.) Roorda was one the best handcrafters that worked with Pioneer. (*Id.* ¶ 22.) Peter Arnold and Shawn Oviatt are also handcrafters of log homes that worked with Pioneer. (*Id.* ¶¶ 23–24.) On September 20, 2016, John Leszczynski sent Roorda the following email:

> Below there is $861,000CAD worth of jobs that I feel we could close. There will be more by the end of the year. What do you think it should cost to build these? Labor and materials only. If you are 20% less than Pioneer There (sic) will be over $170,000CAD after everything is paid for. A guy could make a living at a business like this.

(*Id.* ¶ 25.) At the time of the email, Leszczynski had conversations with Roorda about leaving Pioneer. (*Id.* ¶ 26.)

On August 29, 2017, Leszczynski forwarded communications from customers Eve and Marc Weingardt to Roorda and stated the following:

> Here's my latest correspondence. If they decide to move forward I hope you're still interested. The car port is still available but I understand it's probably not enough work for you to make a move. I also have an Anchorage plan for the Mueller family that I hope to be closing by the end of September. FYI Pioneer

has had nothing to do with this lead. There are other opportunities that will unfold in the next couple months for Spring 2018 deliveries. The backwoods restaurant project is a couple weeks away from City approval, this will be another early spring project.

I hope you consider taking on silent partner if you move forward. It can be structured many different ways but regardless how we work out the details I believe it would be the most lucrative venture for both of us….

(*Id.* ¶ 27.) Rustic was the silent partner referred to by Leszczynski in the email. (*Id.* ¶ 28.)

Leszczynski did not inform Pioneer of his discussions with Roorda because he did not

"believe it would be any of their business." (*Id.* ¶ 30.) On May 27, 2019, Leszczynski informed

Gary Crosina:

I'm starting to put the pieces together. Even though it hasn't been mentioned, I know Peter and Joel are out. It's a small world. I have also heard of others leaving Pioneer.

\* \* \*

When, and if, I decide to work with them will not be a conversation I have with Pioneer.

(Defs.' APFOF ¶ 105 and Pl.'s Reply to Defs.' APFOF ¶ 105.) Roorda, Arnold, and Oviatt

left Pioneer in early 2019 to work for themselves under the business name Top Notch Log

Homes Ltd. ("Top Notch"). (DPFOF ¶ 31 and Pl.'s Resp. ¶ 31.) Top Notch and Pioneer

became competitors. (*Id.* ¶ 32.)

*Jeffery and Scott Law*

Pioneer provided Rustic with the sales lead for Jeffery Law on February 15, 2018,

wherein Jeffery Law inquired about "adding 3-4 bedroom log cabins on our property along

with a corporate retreat facility." (*Id.* ¶ 33.) On March 2, 2018, Leszczynski forwarded his

communications with Jeffery Law to Roorda and stated:

Here's a trail of emails with Jeff Law. This guy is very financially qualified and serious about building four (maybe five) Alamo type homes. I wouldn't be

surprised if he adds a bunch of bells and whistles (roof rafters, valleys etc.). I'm scheduled to meet with him on March 13.

To close this deal with you as the handcrafter (our new venture), I think I'm going to have to tell Jeff we can deliver the first of four in July. Will you be prepared to make that commitment? I think if we can pull that off the next three are automatic.

I know there's a lot of business details between you and I that need to be discussed. In my mind the highest priority is closing this deal. Please give serious thought about the possibility of having one package ready for delivery in July…I think all of the stars are starting to align. I don't think we could have asked for a better opportunity.

(*Id.* ¶ 34.) On March 2, 2018, Leszczynski wrote to Roorda:

I just heard back from Cullen Dillard. He's picking me up on the 12th with his architect Skip Wallace from Island Architects. This is the guy who wants to build 10 or 12 cabins on a 17 acre Island. We could be busy through next year. Dare to dream.

(*Id.* ¶ 35.) On March 5, 2018, Leszczynski emailed Jeffery Law the following:

I will follow up this email by sending you a profile on Joel Roorda. It's my opinion he is one of the best in the world at log construction. If you're interested you can check his Facebook and twitter accounts. He would be perfect for your project.

(*Id.* ¶ 36.) That same day, Leszczynski sent Jeffery Law the Pioneer profile for Roorda. (*Id.* ¶ 37.) Leszczynski did not inform Pioneer of any of these communications. (*Id.* ¶ 38.)

On March 12, 2018, Leszczynski sent Jeffery Law more information on Roorda, stating: "Joel and I have been planning this move for over a year. We are excited and completely prepared to exceed your highest expectations." (*Id.* ¶ 39.) Further, that same day, Leszczynski sent Jeffery Law the design plans of Tracy/Jack Koziol and John/Marsha Herr. (*Id.* ¶ 40.) Leszczynski also provided Jeffery Law with contracts for a single cabin and four

cabins. (*Id.* ¶ 41.) On April 9, 2018, Leszczynski forwarded more correspondence with Jeffery

Law to Roorda:

> I wanted you to be able to see some of the correspondence with Jeff Law. Besides the email trail below I have 11 text messages and probably a dozen phone calls (I did not send all the attachments).
>
> As you can see after reading the last email April 9, 2018 I'm still waiting. Every time I send an email I hope it sparks a reply. You'll be the first to here (sic).
>
> I hope you're not losing any enthusiasm. I am all in.

(*Id.* ¶ 42.) The Law project stalled as of April 2018. (*Id.* ¶ 43.)

On February 11, 2019, Scott Law, Jeffery Law's brother, sent Leszczynski two emails

in response to the contracts that were provided to Jeffery Law and stated as follows:

> John, I just noticed it's not Pioneer log homes building it it's (sic) the guy who was breaking off! I don't want him. I want a genuine pioneer log home. Why the switch?
>
> * * *
>
> You did tell me that he was breaking away, but I didn't agree to that option, we then watched countless video's and looked at brochures by Pioneer! Not Joel! The design was under Pioneer Log Homes Midwest and you rejected my lawyers comments out of hand so when considering spending $600k with you and another $600 for someone to finish, on a business I've never seen, never researched or even looked into a reference and you say now that I'm not even in line to start till September doesn't sit well with me! I think I'm going to reconsider my options at this point.

(*Id.* ¶ 45.) Leszczynski responded to Scott Law's emails by telling him: "I still think that Joel

will do a higher-quality job and deliver quicker." (*Id.* ¶ 46.) Leszczynski further stated that

"[i]n the near future I plan to consolidate all my sales with Joel and Peter." (*Id.*) On February

12, 2019, Leszczynski wrote the following to Scott Law:

> Joel has built all over the world. For 25 years he was in charge of the biggest, most complicated and unique cabins that ever left the Pioneer yard. Guys like Joel, Peter and Sean built Pioneer, they were the best part of Pioneer. They will not disappoint you.

Pioneer Log Homes of British Columbia has been under new ownership for the past two years, in that time approximately one third of the staff has left. Leadtimes have increased and customer relations have suffered….

(*Id.* ¶ 47.) Scott Law responded to Leszczynski with several questions:

Why are we not using pioneer? Is there a non-compete? The marketing material is all pioneer, has he built any other cabins on his own? When did he leave? Seems like your time-line is not that different that (sic) pioneer? Why is the price the same if its not pioneer with all the years standing behind it what are our protections? Just a few questions I will need answered? Are you no longer representing pioneer?

(*Id.* ¶ 48.) Leszczynski responded to Scott Law by stating, in part:

Legally I am an exclusive independent distributor of Pioneer Log Homes of BC. My distributorship contract hasn't changed in 12 years. Pioneer is bound to exclusively work thru (sic) my company in a five state area. My company does not have a reciprocal exclusivity agreement. In the past two years leadtimes have increased and prices have gone up substantially. Employee morale under the new ownership is low. I knew I needed to find new high quality options to stay viable.

(*Id.* ¶ 49.) On February 13, 2019, Jeffery Law informed Leszczynski that he wanted a proposal from Pioneer:

[W]e would like request (sic) a proposal from both Pioneer and Joel including cost and delivery time, best and final offer to produce one cabin. We would like for Joel to include financial stability information in his proposal. Right now it does not look like we will have a cabin completed by July 4th so the delivery time is not as crucial but time is still of the essence. Unless Joel can come back with a compelling reason why to move away from Pioneer, such a (sic) better pricing/timing/ect. (sic), then he is leaning toward waiting for the known, which is Pioneer.

(*Id.* ¶ 50.) Pioneer asserts that Leszczynski did not inform Pioneer about Jeffery Law's request or obtain a quote from Pioneer as directed by Jeffery Law, while Rustic claims that it had already obtained a quote from Pioneer and Leszczynski already had the pertinent information needed to answer Jeffery Law's questions. (*Id.* ¶ 51.) Rustic and Top Notch built Jeffery and Scott Law two cabins and a tree house/deer stand. (*Id.* ¶ 52.) Rustic used a third log home

manufacturer, Moore Log and Timber Homes, to build Jeffery and Scott Law a third cabin. (*Id.* ¶ 53.)

*Kevin Reha*

Pioneer provided Rustic with the sales lead for Kevin Reha, who wanted information on Pioneer's Waterloo floor plan, on September 11, 2018. (*Id.* ¶ 54.) On January 18, 2019, Leszczynski forwarded his communications with Kevin Reha to Roorda and requested a price quote from Top Notch on a Pioneer Waterloo plan. (*Id.* ¶ 55.) Leszczynski did not inform Pioneer that he was discussing the Kevin Reha lead with Top Notch. (*Id.* ¶ 56.)

On April 11, 2019, Kevin Reha informed Leszczynski: "[l]ast but not least, no word will get to Pioneer Log Homes or Donna of our situation. We understand the circumstances and will act accordingly." (*Id.* ¶ 57.) On May 27, 2019, Leszczynski told Kevin Reha: "Gary called last week because Pioneer is getting worried about how much work Joel may be doing with me. It's really none of their business, so if you don't mind I'd like to keep it confidential." (*Id.* ¶ 58.) Leszczynski also sent Kevin Reha the following:

> Why don't you send Gary a quick email. Tell him you're at work and would prefer email. Ask if it was anything in particular he needed. Let him know you're hoping to get good news from the HOA tonight. Tell him depending on the outcome we have a tentative meeting scheduled. I would also let him know you hope to be able to approve final plans any day. Lastly, briefly and vaguely explain there are still other approvals necessary. Keep in [sic] short and sweet.

(Defs.' APFOF ¶ 111 and Pl.'s Reply to Defs.' APFOF ¶ 111.) Kevin Reha built a home with Rustic and Top Notch that was constructed in June 2020. (DPFOF ¶ 59 and Pl.'s Resp. ¶ 59.)

*Lonie Glieberman*

On October 31, 2018, Pioneer provided Rustic a plan and price quote to build a Pioneer Mount Bohemia plan for Lonie Glieberman. (*Id.* ¶ 62.) On March 29, 2019,

Leszczynski forwarded a plan and price quote to Roorda, stating: "October 2018 Pioneer priced out one Mount Bohemia cabin at $45,600 US ($60,800 cad) see email below." (*Id.* ¶ 63.) Leszczynski advised Roorda: "I think we are going to need your price at $60,000 cad + 10 for transportation…Honestly, even if my commission was minor I want to make this work. It would be a great intro to Top Notch." (*Id.* ¶ 64.)

*Jason and Tanya Morley, Stu and Betsy Zadra, and Mr. Orning*

Pioneer provided a sales lead to Rustic for Jason and Tanya Morley. (*Id.* ¶ 60.) Rustic introduced the Morleys to Top Notch, but they have not built anything yet. (*Id.* ¶ 61.) Rustic and Top Notch built Stu and Betsy Zadra a 4,000 square foot log home excluding the lower level in northern Wisconsin. (*Id.* ¶ 65.) Rustic did not discuss the Zadras with Pioneer. (*Id.* ¶ 66.) Rustic also built a cabin with Top Notch located in Minnesota for Mr. Orning in January 2020. (*Id.* ¶ 67.) Rustic met Mr. Orning at a trade show in Minneapolis. (*Id.* ¶ 68.)

*Evolution of Parties' Relationship and Termination of the Agreement*

Around 2017 or 2018, Pioneer began increasing its prices to distributors, including Rustic. (PPFOF ¶ 92 and Defs.' Resp. ¶ 92.) On January 30, 2018, Pioneer sent Rustic a sales lead in which the customer asked for pricing on the Alamo log home package. (*Id.* ¶ 93.) Pioneer informed Rustic that the price for the Alamo log home package would be $183,855 USD NET plus three trucks, which was a 10% price increase over the wholesale price Pioneer gave Rustic for that same log home a month earlier. (*Id.* ¶¶ 94–95.)

In 2018, Pioneer changed the terms upon which it would sell and deliver log packages to Rustic. (*Id.* ¶ 99.) Paragraph 3(a) of the Agreement requires Rustic to pay Pioneer the "full wholesale invoice price" as follows:

> One-quarter upon execution of the purchase agreement, one-quarter upon completion of one-half of the construction of the log structure, one-quarter prior to shipment and the remainder of the purchase price shall be paid after the log home structure is set.

(*Id.* ¶ 100.) Pioneer changed the payment terms and required Rustic to pay 33% of the price of the log package when the customer signed a contract, 33% when Pioneer notified Rustic that the package was 50% complete, and the final 33% when the log package was shipped and before it arrived at the customer's building site. (*Id.* ¶ 101.) Rustic asserts that the new payment policy, increased lead times, and increased prices made it more difficult for Rustic to sell Pioneer log home packages. (*Id.* ¶ 102.)

On February 1, 2019, Pioneer gave Rustic a preliminary quote of $148,960 NET delivered on a log package for a project called "The Cove" for Jeffery Law. (*Id.* ¶ 107.) Pioneer also provided Rustic with a preliminary quote of $449,080 on a log home package for Jason Morley on February 1, 2019. (*Id.* ¶ 116.) Further, on March 1, 2019, Pioneer provided Rustic a preliminary quote of $215,560 NET FOB delivered on a log package for Kevin and Linda Reha. (*Id.* ¶ 111.) On May 22, 2019, Crosina emailed Leszczynski for an update on clients, including Kevin Reha, the Morleys, Scott Law, and Lonie Glieberman. (DPFOF ¶ 69 and Pl.'s Resp. ¶ 69.) Leszczynski responded on May 23, 2019 and stated: "I will do everything in my power to sell Pioneer (per contract)." (*Id.* ¶ 70.)

On May 28, 2019, Crosina and Leszczynski had a telephone conversation regarding Pioneer's custom designs and sharing them with competing log home manufacturers such as Top Notch. (*Id.* ¶ 71.) The parties dispute whether Leszczynski verbally agreed in this conversation that he would not use any of Pioneer's custom designs with any other log home builder. (*Id.* ¶ 72.) Crosina confirmed his conversation with Leszczynski by email on May 28,

2019. (*Id.* ¶ 73.) Pioneer asserts that Leszczynski agreed to Crosina's request, while Rustic claims that he did not. (*Id.* ¶ 74.) On July 12, 2019, Pioneer offered new pricing to Rustic for Kevin Reha, Scott Law, Jason and Tania Morley, and Marc and Eve Weingardt, but Rustic did not present the new pricing to these potential customers. (*Id.* ¶¶ 75–76.)

On September 5, 2019, Crosina emailed Jeffery Law, stating: "This letter is to inform you that Pioneer Log Homes of British Columbia (PLH), due to unforeseen circumstances will no longer be affiliated with Pioneer Log Homes Midwest—C/O John Leszczynski." (*Id.* ¶ 108.) Pioneer also emailed Kevin and Linda Reha on September 5, 2019 informing them of the same. (*Id.* ¶ 112.) Crosina offered Jeffery Law a log package for The Cove for the retail price of $112,700.00 USD Delivered. (*Id.* ¶ 109.) Crosina offered Kevin and Linda Reha a log package for the price of $161,750. (*Id.* ¶ 114.) Pioneer also offered direct pricing to Jason Morley on September 5, 2019. (*Id.* ¶ 117.) Pioneer offered to sell Jason Morley a Pioneer log package, at retail, for $323,400. (*Id.* ¶ 118.) On September 23, 2020, Pioneer informed three customers that they could deal directly with Pioneer and did not have to deal with Rustic. (*Id.* ¶ 124.)

Leszczynski could not recall attending any trade shows in 2018. (Defs.' APFOF ¶ 104 and Pl.'s Reply to Defs.' APFOF ¶ 104.) Pioneer contends that Rustic did not attend any trade shows in 2019, but Rustic asserts that Leszczynski attended three trade shows in 2019 and represented and marketed only Pioneer products at all three. (DPFOF ¶ 86 and Pl.'s Resp. ¶ 86.) Rustic listed its model Pioneer home in 2018 and it was sold in February 2019. (*Id.* ¶ 82.) Rustic had storage units—usually at least one but often two—that it rented over the years; Rustic emptied its last storage unit in 2019. (*Id.* ¶¶ 87–88.) Rustic has not had any employees

since 2013. (*Id.* ¶ 89.) For inventory, Rustic has on hand a "miscellaneous assortment" of log components, lumber components, framing components, and finish components. (*Id.* ¶ 90.) This inventory is a combination of leftover materials and materials shipped from British Columbia. (*Id.* ¶ 91.)

Through 2019, Rustic maintained active relationships with several customers and had existing contracts with customers in the exclusive territory. (PPFOF ¶ 103 and Defs.' Resp. ¶ 103.) Rustic claims that Pioneer stopped sending leads in June 2019, while Pioneer asserts that it stopped sending Rustic leads in late July 2019 when it realized that Rustic was being dishonest about its business with Top Notch. (*Id.* ¶ 104.) Since October 2019, Rustic has not brought a single customer to Pioneer for anything. (DPFOF ¶ 95 and Pl.'s Resp. ¶ 95.)

The last time Rustic sold a log home built by Pioneer was in 2017, either for Bill and Theresa Griffore or Lonie Glieberman. (DPFOF ¶ 79 and Pl.'s Resp ¶ 79.) The last time Rustic sold a home in Wisconsin built by Pioneer was in 2016. (*Id.* ¶ 80.) As of February 11, 2019, Rustic was working with at least four different log home handcrafters in addition to Pioneer. (*Id.* ¶ 92.) Rustic reported $1,253,426 in sales in 2019. (*Id.* ¶ 78.)

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), a party can seek summary judgment upon all or any part of a claim or defense asserted. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See*

*Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Rustic asserts three causes of action against Pioneer: violation of the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stats. ch. 135; breach of contract; and intentional interference with contract and prospective contractual relations. (Compl., Docket # 1-1.) In turn, Pioneer counterclaims against Rustic for breach of contract, fraudulent misrepresentation, civil conspiracy, and statutory and common law misappropriation of trade secrets. (Answer and Counterclaims, Docket # 14.) Again, Rustic moves for summary

judgment in its favor as to all claims, while Pioneer moves for summary judgment in its favor on Rustic's claims and its breach of contract counterclaim. I will address each argument in turn.

1. *Rustic's Claims*

    1.1    Violation of the WFDL

Rustic asserts that Pioneer's termination of the Agreement without notice and cause violated the WFDL. (Pl.'s Br. at 8, Docket # 60.) A threshold issue is whether the WFDL— which partly governs the rights of parties to a "dealership"—applies. The WFDL defines a dealership as:

> A contract or agreement, either express or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services . . . in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3)(a).

Wisconsin courts typically consider three elements when determining whether the definition of a dealership is met: "(1) the existence of a contract or agreement between two or more persons; (2) by which a person is granted one of the rights specified; and (3) in which there is the requisite 'community of interest.'" *Benson v. City of Madison*, 2017 WI 65, ¶ 35, 376 Wis. 2d 35, 897 N.W.2d 16. Here, there is no dispute that the Agreement granted Rustic the exclusive right to sell and distribute Pioneer's products in a defined territory. The parties dispute, however, the existence of a "community of interest."

A "community of interest" is defined as a "continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Wis. Stat. § 135.02(1). In *Ziegler Co., Inc. v. Rexnord, Inc.*, the Wisconsin

19

Supreme Court identified two "guideposts" that are central to the inquiry of whether parties share a "community of interest": a continuing financial interest, or a "shared financial interest in the operation of the dealership or the marketing of a good or service," and interdependence, or the "degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." 139 Wis. 2d 593, 604–05, 407 N.W.2d 873, 878–79 (1987). These two guideposts require an alleged dealer to demonstrate "a stake in the relationship large enough to make the grantor's power to terminate, cancel or not renew" an agreement a threat to the alleged dealer's economic health. *Id.* at 605. "The alleged dealer's economic health is threatened where a termination . . . would have a significant economic impact on the alleged dealer." *Id.*

The *Ziegler* court further enumerated a non-exhaustive list of factors to consider when determining whether a continuing financial interest and interdependence are present:

> how long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising and promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

*Id.* at 606, 879–80. Analysis of the factors set forth in *Ziegler* is not mandatory. *See Benson*, 2017 WI 65, ¶ 49 n.15 ("Although we have stated that [the *Ziegler* factors] 'should' be considered by courts . . . it is more accurate to say that some or all 'may' be considered; the

factors are meant to be a helpful aid in addressing the overriding community of interest question, not an unwieldly burden.").

The Seventh Circuit has distilled the *Ziegler* factors into "two highly important questions in establishing a community of interest: (1) the percentage of revenues and profits the alleged dealer derives from the grantor and (2) the amount of time and money an alleged dealer has sunk into the relationship." *Home Protective Servs., Inc. v. ADT Sec. Servs., Inc.*, 438 F.3d 716, 719 (7th Cir. 2006) (citation omitted). "The ultimate question is whether the grantor has the alleged dealer 'over a barrel'—that is, whether it has such great economic power over the dealer that the dealer will be unable to negotiate with the grantor or comparison shop with other grantors." *Id.* The *Ziegler* factors "are helpful in that they may be suggestive of the earmarks of a community of interest, but the absence of concrete sunk investments or substantial revenues reliant on the relationship may undermine their usefulness and rebut their probative value." *Heat & Power Prod., Inc. v. Camus Hydronics Ltd.*, No. 07-C-639, 2007 WL 2751862, at *4 (E.D. Wis. Sept. 18, 2007).

Based on the undisputed evidence in the record, no reasonable fact finder could conclude that Rustic and Pioneer shared a community of interest in selling or marketing Pioneer's log homes. In arguing a community of interest exists, Rustic relies heavily on the *Ziegler* factor of "how long the parties have dealt with each other." Rustic urges consideration of the business relationship "in its totality," arguing this means looking at the factors as they apply during the entire course of the business relationship. (Pl.'s Br. in Opp. at 3, Docket # 67, citing *Moe v. Benelli U.S.A. Corp.*, 2007 WI App 254, ¶ 16, 306 Wis. 2d 812, 743 N.W.2d 691.)

But that is not what the *Moe* court means by looking at the business relationship "in its totality." Recall that the *Ziegler* court explained that there are two guideposts to assist courts in determining whether a community of interest exists in a given case—continuing financial interest and interdependence. The factors articulated by the *Ziegler* court "may relate to one or both of the guideposts." *Moe*, 2007 WI App, ¶ 16. As the Seventh Circuit put it, the bottom-line question is whether the putative grantor has the putative dealer "over a barrel." For many business relationships, the longer the relationship, the more intertwined the two businesses become. There is no question that in this case, the parties had a business relationship spanning nearly two decades. But this factor is only relevant and helpful to the extent that it shows the financial interdependence between a putative dealer and a putative grantor.

Rustic also cites the extent of the obligations imposed on the parties by the Agreement. Rustic notes that it was required to maintain competent and well-trained sales staff to promote and sell Pioneer's products and meet customers' needs; actively and reasonably promote the marketing and sale of Pioneer's products; perform reasonably assigned functions for Pioneer; comply with all of Pioneer's reasonable specifications for marketing, handling, storage, and shipping of Pioneer's products; and utilize sales leads furnished by Pioneer in conjunction with Pioneer's products. (Pl.'s Br. in Supp. of Summ. Judg. at 10, Docket # 60.) Rustic also points out Pioneer's obligations to promptly send sales leads to Rustic and sell Rustic products at wholesale price. (*Id.*) While these contractual requirements suggest some level of continuing financial interest and interdependence between the parties, there is no indication of how the requirements would threaten Rustic's financial health if the Agreement was terminated, or how the requirements exhibit Pioneer's superior bargaining power over Rustic.

Additionally, Rustic argues that its financial viability is tied to its relationship with Pioneer. Leszczynski avers that in the last sixteen years, Rustic derived more than 95% of its gross revenues and profits from selling Pioneer's product lines. (First Declaration of John Leszczynski ¶ 28, Docket # 19.) He further argues that only "until recently," he spent 95% of his time marketing and selling Pioneer's products. (*Id.* ¶ 30.) Rustic's contentions, however, are belied by the undisputed evidence in the record. As to revenue, Rustic sold no Pioneer homes in 2018 and 2019 and still reported $1,253,426 in sales in 2019 alone. (DPFOF ¶¶ 78– 79 and Pl.'s Resp ¶¶ 78–79.) Even assuming Rustic is correct that it was unable to sell any Pioneer homes in 2018 and 2019 because Pioneer began increasing its prices and ceased sending leads, Rustic was still able to make significant sales without Pioneer's business. As Leszczynski explained to prospective customer Scott Law, Rustic did not have a reciprocal exclusivity agreement with Pioneer and was allowed to work with other log home package builders. (DPFOF ¶ 49 and Pl.'s Resp. ¶ 49.) And Leszczynski did, in fact, build a log cabin for the Laws using Moore Log and Timber Homes. (*Id.* ¶ 53.) The bottom line is that Rustic's sales in 2018 and 2019, even without Pioneer's business, undermine Rustic's argument of financial interdependence with Pioneer.

Furthermore, while Rustic argues that Pioneer's own actions explain why it made no Pioneer sales in 2018 and 2019, this does not explain why Rustic's sales of Pioneer's products was on a steady decline even prior to 2018. Rustic's sales of Pioneer products in 2015 was $1,047,750; in 2016 was $510,00; and in 2017 was $446,850. (Fourth Declaration of John Leszczynski ¶ 7, Docket # 74.) This undisputed evidence cuts strongly against Rustic's contention of financial interdependence with Pioneer. *See Home Protective Servs., Inc.*, 438 F.3d at 720 (affirming district court's finding of no community of interest, although it was

undisputed that alleged dealer derived 95% of its revenue and devoted 95% of its personnel hours to alleged grantor, where alleged dealer found another grantor to work with).

Regarding marketing, Leszczynski avers that Rustic spent $20,000-$80,000 per year advertising and promoting Pioneer Homes. (First Declaration of John Leszczynski ¶ 4.) This, however, is a very wide range of numbers and Leszczynski gives no indication as to exactly what amount was spent and when. He asserts that it was only until "recently" that 95% of his time was devoted to the sale of Pioneer's products. (*Id.* ¶ 30.) But looking at the record evidence, it could not have been too "recently" that Rustic no longer devoted 95% of its time to the sale of Pioneer's products. Again, by June 2019 at the earliest, Rustic's leads from Pioneer ceased. (PPFOF ¶ 104 and Defs.' Resp. ¶ 104.) However, well before 2019, Rustic's sales of Pioneer products steadily decreased, with its 2017 sales equaling less than half of its 2015 sales. (Fourth Declaration of John Leszczynski ¶ 7.) While Leszczynski asserts that from 2003 through 2011, Rustic devoted up to five full-time employees to sales, administration, and marketing of Pioneer's products (First Declaration of John Leszczynski ¶ 30), the more recent dwindling sales suggest significantly less resources were devoted to Pioneer. Thus, this factor does not weigh in favor of a community of interest.

Rustic further cites the fact that it makes use of Pioneer's marks and logos and started doing business as Pioneer Log Homes Midwest, as well as the fact that it has been Pioneer's exclusive dealer in parts of Wisconsin, Illinois, Minnesota, and Michigan for over 12 years. (Pl.'s Br. in Supp. of Summ. Judg. at 10–11.) Rustic's use of Pioneer's marks and logos and the extent of its exclusive territory do demonstrate some level of interdependence between the parties. However, the importance of these factors is undercut by the facts demonstrating that

Rustic increasingly relied less on Pioneer for sales and actively worked with builders besides Pioneer.

Regarding investment in inventory, facilities, and good will, Rustic points to the model Pioneer home investment on Highway 43 and Highway 60 in Grafton, Wisconsin in 2003, which it utilized as an office space, along with a billboard on Highway 43 that was used to promote Pioneer. (Pl.'s Br. in Supp. of Summ. Judg. at 11.) However, Rustic listed the model home in 2018 and sold it—along with the accompanying billboard—in February 2019 (prior to the leads from Pioneer ceasing). (DPFOF ¶ 82, 84 and Pl.'s Resp. ¶ 82, 84.) Although there is no evidence as to the sale price, the sale of these investments indicates that they are not sunk costs that Rustic will have to bear as a result of the Agreement's termination. Rustic also asserts that it purchased, maintained, and stored trucks, tools, and equipment for products sold in the territory. (*Id.*) The cost and extent of this inventory—as well as whether it is specific to Pioneer— is unclear. Thus, there is no evidence to demonstrate that these costs were sunk. There is evidence, however, that Rustic usually maintained one or two storage units over the years, but emptied its last storage unit in 2019. (DPFOF ¶ 87–88 and Pl.'s Resp. ¶ 87–88.)

Rustic also asserts that it attended approximately 70 trade shows in 16 years to promote Pioneer's homes. (Pl.'s Br. in Supp. of Summ. Judg. at 10.) Leszczynski testified that he could not recall attending any trade shows in 2018 or 2019. (Defs.' APFOF ¶ 104 and Pl.'s Reply to Defs.' APFOF ¶ 104.) Even crediting Leszczynski's later statement that he attended three trade shows in 2019 where he only marketed Pioneer products, the attendance at trade shows does not weigh heavily toward finding a community of interest; rather, the probative value of this factor is outweighed by the fact that Rustic has few, if any, sunk costs and little financial dependence on Pioneer. Further, Rustic claims that it purchased ten homes from

Pioneer for display at trade shows that required assembly and disassembly, travel equipment and materials, a crane, and a full crew. (PPFOF ¶ 65.) However, there is no evidence as to the cost and whether termination of the Agreement renders these investments useless.

Finally, Rustic argues that it provided supplemental services to Pioneer's customers because it works collaboratively with the designer, customer, and builder during the design phase. (Pl.'s Br. in Supp. of Summ. Judg. at 11.) Rustic asserts that Leszczynski was present on the job site and addressed any issues or complaints about the Pioneer log home packages "to ensure that customers are satisfied with the construction process and the final product." (*Id.*) While supplemental services provided by Rustic does demonstrate some interdependence between the parties, there is no indication that the nature or extent of these supplemental services compels a finding of a community of interest. Rustic does not argue that these supplemental services were unique to Pioneer, took considerable time, expense, or effort, or were not provided to other manufacturers it worked with. As such, this factor does not weigh heavily toward finding a community of interest.

Again, the ultimate inquiry is whether termination of the Agreement would have a significant economic impact on Rustic. Here, the undisputed evidence does not demonstrate that Rustic's financial well-being depended on selling Pioneer's log homes or that the parties coordinated their efforts to sell these homes. As such, I conclude that no community of interest existed between the parties. Because Rustic was not a "dealer" entitled to the protections of the WFDL, I need not consider whether Pioneer's actions violated the statute.

### 1.2 Breach of Contract

Rustic also alleges that Pioneer breached the parties' Agreement. (Compl., Second Claim for Relief.) Both parties move for summary judgment in their favor on this claim. In

Wisconsin, the elements of a breach of contract claim are: "(1) the existence of a contract creating obligations flowing from defendant to plaintiff; (2) a breach of those obligations; and (3) damages from the breach." *Uebelacker v. Paula Allen Holdings, Inc.*, 464 F. Supp. 2d 791, 801 (W.D. Wis. 2006) (citing *Nw. Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 187 N.W.2d 200, 203 (1971)).

The parties do not dispute that a valid contract exists. Rather, they dispute whether the contract was breached and whether Rustic suffered damages. As relevant here, the parties' Agreement appoints Rustic as Pioneer's exclusive distributor for the purchase and resale of Pioneer's products in certain enumerated territories. The Agreement also obligates Pioneer to "promptly refer 'leads' or other inquiries from potential sales to [Rustic] in the appropriate Territory." (Compl. at 17.) Finally, the Agreement allows either party, after giving a 30-day cure period, to cancel the Agreement after due demand in writing if a party fails to carry out any of the conditions of the Agreement, (*id.* at 19), but also gives Pioneer the right to terminate the Agreement without notice under certain conditions, including the discontinuance of Rustic's active marketing, distribution or sale of Products for a period of six consecutive months or in the event Rustic converts or embezzles Pioneer's property (*id.* at 18).

Rustic argues that Pioneer breached the Agreement by violating each of these provisions. Specifically, Rustic argues that Pioneer breached its right as the exclusive distributor for purchase and resale of Pioneer's products by selling a character tree directly to the Griffores without involving Rustic and working on the design of a log home for the Griffores. (Pl.'s Br. in Supp. of Summ. Judg. at 16.) Rustic further alleges that Pioneer breached its duty to promptly refer leads when it waited until October 20, 2020 to provide leads from July 2019 through October 2020. (*Id.*) Finally, Rustic argues that Pioneer breached

the Agreement by unilaterally cancelling the contract without notice, then contacting Rustic's customers, offering them discounted pricing, and telling them Rustic was no longer affiliated with Pioneer. (*Id.*)

Pioneer asserts that it did not breach the Agreement, arguing that "[b]y the terms of the Agreement, Rustic is named as the exclusive distributor in the defined territory and Pioneer is obligated to forward sales leads to it. But the Agreement does not by its terms prohibit Pioneer from directly undertaking sales efforts in the territory itself, which is the gist of the actions that Rustic complains of." (Defs.' Br. in Supp. of Summ. Judg. at 19, Docket # 56.) Pioneer further counters that the Agreement does not specify a time frame for providing leads and that any delay was minimal, especially considering this lawsuit was filed in October 2019. (Defs.' Br. in Opp. at 16.) Pioneer also argues that the Agreement does not prohibit Pioneer from communicating with prospective customers in Rustic's territory. (*Id.* at 17.) Finally, Pioneer contends that it did not breach the Agreement by unilaterally canceling without notice because Rustic materially breached the Agreement, excusing further performance by Pioneer, and because Rustic discontinued active marketing, distribution, or sale for six consecutive months and converted Pioneer's property. (*Id.* at 17–18.)

Questions of material fact exist that prevent granting summary judgment to either party. While Pioneer contends that the Agreement did not prevent it from selling directly to customers, the Agreement calls Rustic the "**exclusive** distributor for the purchase and resale of the product of [Pioneer] in the relevant areas." A reasonable jury could find that Pioneer's June 2017 sale of a $95,000 character tree directly to the Griffores breached the Agreement. Further, a reasonable jury could find that Pioneer's delay from July 2019 to October 2020 of leads was not "prompt" as required by the contract. Finally, a reasonable jury could find that

28

Pioneer breached the Agreement when it terminated the Agreement in September 2019. While Pioneer contends that it was allowed under the terms of the Agreement to unilaterally terminate if Rustic either converted or embezzled property or failed to market and/or make sales for six consecutive months, as will be discussed further below, there is a question of fact as to whether Rustic misappropriated Pioneer's trade secrets and it is undisputed that the Agreement had no minimum sales requirement and that Pioneer did not, in fact, cancel the contract until nearly two years into Rustic falling to make sales. Furthermore, it is unclear how Rustic's failure to make sales in 2018 and 2019 would excuse Pioneer's alleged 2017 breach by selling directly to the Griffores.

For these reasons, both parties' motion for summary judgment as to Rustic's breach of contract claim are denied.

### 1.3 Intentional Interference with Contract and Prospective Contractual Relations

Rustic asserts a claim for intentional interference with contract and prospective contractual relations against Pioneer. (Compl., Third Claim for Relief.) In Wisconsin, the elements of a tortious inference claim are: "(1) the plaintiff had a contract or a prospective contractual relationship with a third party; (2) the defendant interfered with that relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and damages; and (5) the defendant was not justified or privileged to interfere." *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 44, 294 Wis. 2d 274, 304, 717 N.W.2d 781, 796.

Rustic contends that the undisputed facts demonstrate the requisite elements of the claim. Specifically, Rustic asserts that on September 5, 2019, it had prospective contractual relationships with the Rehas, the Laws, and Jason Morley. (Pl.'s Br. in Supp. of Summ. Judg.

at 17–18.) Rustic argues that Pioneer interfered with these prospective relationships by emailing these individuals that it was no longer affiliated with Rustic and that they could buy log homes packages directly from Pioneer. (*Id.* at 18.) Further, Rustic argues, the interference was intentional because the "only reasonable outcome" of Pioneer's emails was influencing customers to work directly with Pioneer and not Rustic. (*Id.*) Rustic asserts that because Pioneer's actions breached the Agreement, the actions were unlawful. (*Id.*) Finally, as to damages, Rustic contends that Pioneer's interference "threatened and curtailed [Rustic's] existing and potential relationships," harmed its reputation and caused confusion about its status in the territory, and stripped it of the chance to build upon and profit from the relationships. (Pl.'s Br. at 19.)

Pioneer contends that Rustic's claim must be dismissed because there is no evidence that Pioneer's alleged interference caused Rustic damages. (Defs.' Br. in Supp. of Summ. Judg. at 21–22.) This is so, Pioneer argues, because the Rehas and the Laws ended up building with Top Notch, and there is no evidence that Pioneer's conduct caused Jason Morley not to build. (*Id.*) I agree. Rustic points to no evidence of a causal connection between Pioneer's alleged interference with the three relationships at issue and Rustic's alleged damages.

Accordingly, I find that Rustic's claim fails as a matter of law and must be dismissed. Pioneer is entitled to summary judgment on this claim.

### 2.    *Pioneer's Counterclaims*

Pioneer asserts five counterclaims against Rustic: breach of contract, violation of Wis. Stat. § 100.18, violation of Wis. Stat. § 134.01, and statutory and common law misappropriation of trade secrets. Rustic moves for summary judgment in its favor as to all of

Pioneer's counterclaims, and Pioneer moves for summary judgment in its favor as to its breach of contract counterclaim. I will address each in turn.

### 2.1 Breach of Contract

In its counterclaim for breach of contract, Pioneer alleges that Rustic breached the Agreement "through unauthorized use of Pioneer's proprietary custom log cabin designs and by contracting to do business with Pioneer's direct competition, an entity operated by former employees of Pioneer." (Answer and Counterclaims ¶ 55.) In its brief in support of its motion for partial summary judgment, Pioneer additionally contends that Rustic breached various other provisions of the Agreement, including various obligations set forth in Paragraph 6. (Defs.' Br. in Supp. of Summ. Judg. at 23.)

First, Pioneer argues that Paragraph 6(e) of the Agreement obligated Rustic to "utilize all sales leads furnished by Pioneer in conjunction with selling Pioneer products, without exception." (*Id.*) Pioneer argues that Rustic breached the Agreement by utilizing the leads for the Laws and Kevin Reha to sell Top Notch or another log home manufacturer's product. (*Id.*) Pioneer next contends that, through its campaign to convince Scott Law to use Top Notch over Pioneer, Leszczynski "disparaged Pioneer on multiple occasions," thereby breaching Rustic's promises in Paragraph 6 to reasonably promote the marketing and sale of Pioneer's products, conduct business in a manner that reflects favorably on Pioneer, and protect Pioneer's good will and reputation throughout the territory. (*Id.* at 24.)

Pioneer further alleges that Rustic breached the confidentiality provision of Paragraph 13 of the Agreement by soliciting Joel Roorda to "leave and compete against Pioneer by sending him Pioneer's confidential plans and pricing as early as September 2016," by sending Jeffery Law plans that Pioneer had custom designed for two former customers, and by sending

31

Lonie Glieberman a quote that Pioneer provided to Rustic to Roorda so that Top Notch could engineer a more attractive bid. (*Id.* at 24–25.)

Rustic argues that Pioneer's breach of contract counterclaim must fail because the Agreement's confidentiality provision does not expressly apply to the design plans; the Design Agreement does not contain a confidentiality provision; no contract term limits the use of the design plans; no provision in the Agreement limits or prohibits Rustic from working with other builders; Pioneer displays plans of its website for public access and takes no specific efforts to mark or keep its plans or prices confidential; and because Pioneer allowed customers to own and use the design plans, any alleged breach by disclosing the plans was not the cause of damage to Pioneer. (Pl.'s Br. in Supp. of Summ. Judg. at 20.)

Both parties raise disputes of material fact sufficient to send this question to a jury. A reasonable jury could find that Leszczynski's alleged actions in taking leads from Pioneer and then using the leads to contact prospective customers on behalf of Top Notch or Rustic without Pioneer's involvement breached several potential provisions of the parties' Agreement, including Section 6(c)–(e) and Section 13. Both parties' motions for summary judgment as to this counterclaim are denied.

### 2.2     Wis. Stat. § 100.18

Pioneer alleges that Rustic violated Wisconsin's Deceptive Trade Practices Act ("WDTPA"), Wis. Stat. § 100.18(1). (Answer and Counterclaims ¶¶ 59–62.) The elements of a § 100.18(1) claim are: "(1) the defendant made a representation to one or more members of the public with the intent to induce an obligation; (2) the representation was untrue, deceptive or misleading; and (3) the representation materially induced a pecuniary loss to the plaintiff." *Hinrichs v. DOW Chem. Co.*, 2020 WI 2, ¶ 85, 389 Wis. 2d 669, 706, 937 N.W.2d 37, 56.

Pioneer alleges that Rustic made untrue, deceptive, or misleading statements and representations to the Laws about the authenticity of the log home Rustic was attempting to sell the Laws; namely, Rustic represented the Top Notch home as a Pioneer log home. (Defs.' Br. in Opp. at 24.)

There is no evidence, however, that the Laws mistakenly contracted for a Top Notch log home with the understanding or belief that it was a Pioneer log home. Instead, the undisputed evidence indicates that the Laws and Leszczynski further discussed the differences between Pioneer and Top Notch, and Scott Law, despite his initial reservations, requested a proposal from Top Notch. (DPFOF ¶¶ 45–50 and Pl.'s Resp. ¶¶ 45–50.) Thus, there is no evidence that Rustic's alleged representation was untrue, deceptive or misleading.

As such, I will dismiss this claim.

### 2.3 Civil Conspiracy

Pioneer asserts a counterclaim for violation of Wis. Stat. § 134.01, Wisconsin's civil conspiracy statute. (Answer and Counterclaims ¶¶ 63–66.) Wis. Stat. § 134.01 prohibits "[a]ny 2 or more persons" from "combin[ing] . . . for the purpose of willfully or maliciously injuring another in his or her reputation, trade, business or profession." To prove a claim under § 134.01, a plaintiff must show that: "(1) the defendants acted together; (2) with a common purpose to injure the plaintiffs reputation or business; (3) with malice; and (4) the plaintiff suffered financial harm." *Virnich v. Vorwald*, 664 F.3d 206, 213 (7th Cir. 2011). Pioneer asserts that Leszczynski, who believed that Pioneer was attempting to drive Rustic out of business, sought revenge by recruiting key employees from Pioneer for the sole purpose of working against Pioneer, using Pioneer's commercial symbols and confidential information, disparaging Pioneer, and converting Pioneer's sales leads to Top Notch. (Defs.' Br. in Opp.

at 21.) As such, Pioneer argues, a reasonable jury could conclude that Rustic and Top Notch's conduct was motivated by retaliation and retribution. (*Id.*)

Rustic asserts that summary judgment is warranted on this claim because Pioneer provides no evidence of a common purpose to injure Pioneer, an actual injury sustained, or malicious intent. (Pl.'s Br. in Supp. of Summ. Judg. at 23.) The parties primarily focus on the element of malice. "For conduct to be malicious under conspiracy law it must be conduct intended to cause harm for harm's sake." *Maleki v. Fine-Lando Clinic Chartered, S.C.*, 162 Wis.2d 73, 86, 469 N.W.2d 629, 634 (1991). Further, malice must be proven with respect to each conspirator. *Id.*

The evidence that Pioneer cites does not suggest that Rustic, let alone both Rustic and Top Notch, acted with malice. Leszczynski averred that changes in pricing and the payment policy between the parties were seemingly an attempt to drive Rustic "out of the business so that Pioneer could sell log home packages directly to customers" in Rustic's exclusive territory. (Second Declaration of John Leszczynski ¶ 15, Docket # 62.) At most, the evidence supports a finding that Leszczynski and Rustic moved towards dealings with Top Notch to make money because the changes occurring at Pioneer made it more difficult to do so. *See Friemuth v. Fiskars Brands, Inc.*, 681 F. Supp. 2d 985, 992 (W.D. Wis. 2010) ("If anything, the allegations suggest that plaintiff and any co-conspirator performed in the allegedly injurious acts to make money (for their own sake), not to make defendant lose money ('for harm's sake')." Further, none of the evidence that Pioneer points to speaks to Top Notch's motivations, and malice must be proven with respect to each alleged conspirator. For these reasons, Rustic is entitled to summary judgment on Pioneer's civil conspiracy claim pursuant to Wis. Stat. § 134.01. This claim is dismissed.

34

Pioneer argues that even if its statutory claim for civil conspiracy fails, it is entitled to pursue damages for common law civil conspiracy. (Defs.' Br. in Opp. at 22.) "Civil conspiracy involves a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful." *N. Highland Inc. v. Jefferson Mach. & Tool Inc.*, 2017 WI 75, ¶25, 377 Wis.2d 496, 898 N.W.2d 741 (internal citation and quotations omitted). A plaintiff who alleges a civil conspiracy claim must show: "(1) the formation and operation of a conspiracy; (2) a wrongful act or acts done pursuant to the conspiracy; and (3) damage resulting from the act or acts." *Id.*

Pioneer claims that the record evidence supports a common law civil conspiracy claim against Rustic because there is evidence of an agreement between Rustic and Top Notch to undermine Pioneer and wrongful acts pursuant to that agreement, such as using Pioneer's commercial symbols to market Top Notch, converting Pioneer-generated sales leads to Top Notch, disparaging Pioneer to the sales leads Pioneer generated, misappropriating Pioneer's confidential communications, plans, and pricing to undercut Pioneer and deceiving Pioneer to believe that Rustic was still acting as its loyal partner in Pioneer's territory. (Defs.' Br. in Opp. at 23.) Further, Pioneer asserts that Rustic caused losses through usurped sales opportunities. (*Id.* at 23–24.)

Rustic argues that Pioneer's counterclaim fails because there is no evidence of a conspiracy with Top Notch. (Pl.'s Reply Br. in Supp. of Summ. Judg. at 14, Docket # 73.) I agree. "While inferences reasonably drawn are appropriate bases for unassailable findings of fact in most cases . . . Wisconsin law in respect to conspiracies imposes a more stringent test. To prove a conspiracy, a plaintiff must show more than a mere suspicion or conjecture that there was a conspiracy or that there was evidence of the elements of a conspiracy." *Maleki*,

162 Wis. 2d at 84, 469 N.W.2d at 633. Based on the record evidence, no reasonable fact finder could conclude that Rustic and Top Notch formed a conspiracy. There is no evidence as to Top Notch's motivations.

As such, I will dismiss this claim.

### 2.4    Wis. Stat. § 134.90

Pioneer asserts a claim for misappropriation of trade secrets in violation of Wis. Stat. § 134.90, Wisconsin's version of the Uniform Trade Secrets Act ("UTSA"). (Answer and Counterclaims ¶¶ 67–75.) Pioneer contends that its custom designs, pricing, and sales leads are trade secrets that Rustic deliberately disclosed to Top Notch without Pioneer's consent and in violation of the Agreement. (Defs.' Br. in Opp. at 27, 29.) A "trade secret" is statutorily defined as information that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts to maintain its secrecy that are reasonable under the circumstances. Wis. Stat. § 134.90(c). Rustic argues that this claim fails as a matter of law because there is no evidence that Pioneer took reasonable steps to keep its alleged trade secrets confidential. (Pl.'s Reply Br. in Supp. of Summ. Judg. at 14.)

As to the efforts taken to maintain the secrecy of alleged trade secrets, "[i]t is not enough simply to restrict access to the facility and require passwords; these are normal business practices in any business. An employer must use additional measures to protect the confidentiality of information he considers to be a trade secret." *Maxpower Corp. v. Abraham*, 557 F.Supp.2d 955, 961 (W.D. Wis. 2008). "In determining whether companies have fulfilled this requirement, Wisconsin courts consider whether the company negotiated confidentiality

agreements, kept documents locked up, limited access to information, restricted building access, denoted documents as 'confidential,' informed individuals that information was confidential, and allowed individuals to keep information after the business relationship had ended." *Starsurgical Inc. v. Aperta, LLC*, 40 F. Supp. 3d 1069, 1082 (E.D. Wis. 2014). The Seventh Circuit has stated that "only in an extreme case can what is a 'reasonable' precaution be determined on a motion for summary judgment, because the answer depends on a balancing of costs and benefits that will vary from case to case." *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991).

Here, Pioneer asserts that the Agreement's confidentiality provision covers its designs, pricing, and sales leads; that the design agreements expressly state that the custom designs belong to Pioneer and the client; that it only works through approved distributors; that it has a dedicated sales manager and distributor contact who communicates with its distributors; that it monitors its distributors to ensure that they are maintaining confidentiality; and takes action against distributors that fail to maintain confidentiality. (Defs.' Br. in Opp. at 28.)

Based on the evidence in the record, I find that a reasonable fact finder could conclude that Pioneer took reasonable efforts to maintain the secrecy of its alleged trade secrets. The confidentiality provision of the Agreement is broad enough to encompass Pioneer's custom designs, pricing, and sales leads. Moreover, the design agreements expressly state that the custom design plans are the property of the customer and Pioneer.

As such, summary judgment on this claim will be denied.

### 2.5    Common Law Misappropriation of Trade Secrets

Finally, Pioneer asserts a claim for common law misappropriation of trade secrets based on its custom design plans. (Answer and Counterclaims ¶¶ 76–84.) In its brief in

opposition to Rustic's motion for summary judgment, Pioneer further contends this claim to its pricing and sales leads. (Defs.' Br. in Opp. at 30.) Rustic contends that this claim fails as a matter of law because Wis. Stat. § 134.90(6) preempts the claim. (Pl.'s Br. in Supp. of Summ. Judg. at 26.) Pioneer responds that, to the extent that its custom designs, pricing, and sales leads "do not meet the statutory definition of a 'trade secret,' that information is subject to the common-law misappropriation doctrine." (Defs.' Br. in Opp. at 30.)

In *Burbank Grease Servs., LLC v. Sokolowski*, the Wisconsin Supreme Court found that the UTSA was intended to "replace all pre-existing definitions of 'trade secret' and remedies for tort claims dependent solely on the existence of a specific class of information statutorily defined as 'trade secrets.'" 2006 WI 103, ¶ 33, 294 Wis. 2d at 298, 717 N.W.2d at 793. The court further found, however, that the UTSA left "available all other types of civil actions that do not depend on information that meets the statutory definition of a 'trade secret.'" *Id.* However, "[t]here is no separate tort of misappropriation of confidential business information under Wisconsin law that applies to non-trade secret information." *Marine Travelift, Inc. v. Marine Lift Sys., Inc.*, No. 10-C-1046, 2013 WL 6255689, at *7 (E.D. Wis. Dec. 4, 2013). Accordingly, Pioneer's common law misappropriation of trade secrets claim is preempted by Wis. Stat. § 134.90(6)(a). Further, there is no authority for proceeding on a common law claim for misappropriation of information that does not meet the statutory definition of a trade secret.

As such, Rustic's motion for summary judgment is granted on this claim.

## CONCLUSION

Based on the undisputed facts in the record, I find that no reasonable fact finder could find in Rustic's favor as to its WFDL and tortious interference claims against Pioneer. Thus,

summary judgment is entered in favor of Pioneer on these claims. Further, I find that no reasonable fact finder could find for Pioneer on its fraudulent misrepresentation, civil conspiracy, and common law misappropriation of trade secrets counterclaims against Rustic. As such, summary judgment is entered in favor of Rustic on these claims. Because genuine issues of material fact exist with respect to each parties' breach of contract claims, as well as Pioneer's statutory misappropriation of trade secrets claim, I will deny summary judgment on these claims.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendants' partial motion for summary judgment (Docket # 55) is **GRANTED IN PART AND DENIED IN PART**. The plaintiff's First and Third Claims for Relief are dismissed with prejudice.

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment (Docket # 59) is **GRANTED IN PART AND DENIED IN PART**. The defendants' Second, Third, and Fifth Counterclaims are dismissed with prejudice.

**IT IS FURTHER ORDERED** that the plaintiff's expedited non-dispositive motion to strike (Docket # 121) is **DENIED AS MOOT**.

Dated at Milwaukee, Wisconsin this 17th day of June, 2021.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge